922

Sydell SHAYER, Linda Claire McDaniel, Shirley Albert, Andi Cenedella, Esther Myers, and Ann Reed, Plaintiffs,

v.

Honorable James C. KIRKPATRICK, Secretary of State of Missouri, Defendant.

City of St. Louis, Vincent C. Schoemehl, Jr., and Geraldine Osborn, Intervenors.

and

St. Louis Regional Commerce and Growth Association, James M. O'Flynn, and John H. Poelker, Intervenors.

William OVERSCHMIDT, Adolph Schatzle, Brian Hall, Mickey Brown, George Engelback, Earl Heitmann and Cecil Crutchfield, Plaintiffs,

v.

Hon. James C. KIRKPATRICK, Secretary of State of Missouri, Defendant.

MISSOURI STATE CONFERENCE OF BRANCHES OF the NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, INC., St. Louis Branch, NAACP, St. Louis County Branch, NAACP, Cape Girardeau Branch, NAACP, Festus-Crystal City Branch, NAACP, Hannibal Branch, NAACP, Malden Branch, NAACP, Mexico Branch, NAACP, Portageville Branch, NAACP, St. Charles Branch, NAACP, Fredda Witherspoon and James DeClue, Plaintiffs,

v.

Honorable Christopher BOND, Governor, and Honorable James C. Kirkpatrick, Secretary of State of the State of Missouri, Defendants.

MISSOURI STATE CONFERENCE OF BRANCHES OF the NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, INC., Kansas City Branch, NAACP, St. Joseph Branch, NAACP, Jefferson City Branch, NAACP, Columbia Branch, NAACP, Chillicothe Branch, NAACP, Kennett-

Dunklin, NAACP, Marshall Branch, NAACP, Joplin Branch, NAACP, Dr. Fredda Witherspoon and Mr. Ommie L. Nelms, Plaintiffs,

v.

Honorable Christopher BOND, Governor, and Honorable James C. Kirkpatrick, Secretary of State of the State of Missouri, Defendants.

Nos. 81-4144-CV-C, 81-4180-CV-C, 81-4196-CV-C and 81-4184-CV-C.

United States District Court, W. D. Missouri, C. D.

Jan. 7, 1982.

Harold L. Fridkin, Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, Kansas City, Mo., for plaintiffs.

John W. Ashcroft, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, Mo., for defendant.

James J. Wilson, Asst. City Counselor, Carroll J. Donohue, St. Louis, Mo., for intervenors.

Before FLOYD R. GIBSON, Senior Circuit Judge, WANGELIN, Chief District Judge, and SCOTT O. WRIGHT, District Judge.

## MEMORANDUM OPINION

FLOYD R. GIBSON, Senior Circuit Judge, joined by SCOTT O. WRIGHT, District Judge.

This is an action in which the court is being asked to redistrict the State of Missouri into nine congressional districts. Missouri is currently divided into ten districts pursuant to the congressional allocation of 1972 and as set forth in *Preisler v. Secretary of State*, 341 F.Supp. 1158 (W.D.Mo. 1972), *aff'd mem. sub nom. Danforth v. Preisler*, 407 U.S. 901, 92 S.Ct. 2440, 32 L.Ed.2d 678 (1972). Because of the population count disclosed by the 1980 decennial census, Missouri is now entitled to only nine members in the United States House of Representatives. In accordance with federal constitutional requirements, appropriate federal legislation, and pertinent Missouri statutes and constitutional provisions, Missouri is obligated to divide the state into nine congressional districts. It has failed to enact an apportionment plan.

### I. Facts

Shortly after the Missouri General Assembly adjourned its regular session on June 15, 1981, without passing a congressional redistricting bill, actions seeking a court-ordered apportionment plan were filed in both the Eastern and Western Districts of Missouri.

The parties challenged the constitutionality of the existing apportionment (now outdated by the new population figures and decreased allocation of congressional districts); therefore, three-judge courts were established pursuant to 28 U.S.C. § 2284(a) (1976). The same judges were named to each panel. The allegations of an unconstitutional apportionment provide the jurisdictional basis. This court has jurisdiction under 28 U.S.C.A. § 1331 (1981 Supp.) (federal question) and 28 U.S.C. § 1343(a)(3) (Supp. III 1979) (deprivation of constitutional rights). The parties also alleged a violation of 42 U.S.C. § 1983 (Supp. III 1979), which provides for liability for deprivation of constitutional rights.

■ We determined that according to 28 U.S.C. § 1391(b) (1976) venue was proper only in the Western District. Section 1391(b) allows a claim to be brought only where all defendants reside or where the claim arose. A claim arises where the complained-of acts or omissions of a defendant occur. 92 C.J.S. *Venue* § 80. The defendant, Honorable James C. Kirkpatrick, Secretary of State, has his offices in the Western District (Jefferson City, Missouri), and his actions relating to elections would occur in the Western District. Therefore, a claim based on his conduct would accrue where his election duties are performed, *i.e.*, the Western District of Missouri. The two cases filed in the Eastern District were transferred to the Western District and consolidated with the actions that were filed in the Western District. All motions to intervene were granted.

We held a hearing on September 28, 1981. Interested persons, both parties and nonparties, were allowed to present plans and suggestions for redistricting. Other plans and suggestions were subsequently filed with the clerk of the court.

In November 1981, the Governor called a special legislative session to consider the congressional redistricting issue. To prevent speculation on the plans of the court from affecting legislative action, we held no hearings and issued no orders while the General Assembly was in session. The General Assembly adjourned its extraordinary session on December 17, 1981, without passing an apportionment plan. Thus, this court is left with the task of providing an apportionment remedy.

## II. Propriety of the Three-Judge Court

■ According to 28 U.S.C. § 2284(a) (1976): "A district court of three judges shall be convened when ... an action is filed challenging the constitutionality of the apportionment of congressional districts ...." The parties alleged a violation of their rights under Article I, § 2 of the United States Constitution. Paragraph 3 of that section reads: "Representatives ... shall be apportioned among the several States which may be included within this Union, according to their respective Numbers ...." Paragraph 1 states: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States ...." Missouri has not enacted a redistricting law consistent with paragraph 3, and failure to do so could result in a deprivation of the right to select representatives, a violation of paragraph 1. Therefore the constitutionality of the present, ten-district apportionment is called into question. It is apparent that the present apportionment plan (based on the 1970 census figures and subsequent allocation of congressional seats) is unconstitutional.

## III. The Constitutional Violation

■ The General Assembly's failure to provide a means for congressional representation would, if unremedied, result in an unconstitutional deprivation of the Article I, § 2, ¶ 1 right of the people to select representatives. Indeed, one authority has called a legislature's failure to reapportion in light of new census figures "patently and obviously unconstitutional." Wright, Miller, and Cooper, Federal Practice and Procedure, § 4235, at 400; *see Ryan v. Board of Elections*, 661 F.2d 1130, 1135 (7th Cir. 1981). The apportionment ordered in *Preisler v. Secretary of State*, 341 F.Supp. 1158 (W.D.Mo.1972), is now outmoded and is unconstitutional because it fails to provide a

means by which Missouri can choose its nine representatives.

Our next task is to determine the proper remedy.

## IV. The Remedy

In formulating the proper remedy, we first note that a declaratory judgment is one permissible remedy. Under 28 U.S.C. § 2201 (Supp. II 1978), that remedy is available in cases of "actual controversy," and 28 U.S.C. § 2202 (1976) allows for further relief based on a declaratory judgment. We are also aware that 42 U.S.C. § 1988 (1976) requires use of the common law when necessary to furnish suitable remedies. That section is applicable to the instant case because it applies to actions brought under 42 U.S.C. § 1983 (Supp. III 1979). See section I, *supra.*

Beyond these general considerations, we perceive two possible remedies. First, we could draw a court plan. Second, we could have elections at large, either by court order or by dismissal of the actions.

The first option was adopted by the three-judge court in *Preisler v. Secretary of State.* There the court also found an apportionment unconstitutional. In that case, population shifts disclosed by the 1970 census showed population variances between districts so great as to be unconstitutional. 341 F.Supp. at 1160. To remedy the situation the court invalidated the then-existing apportionment and drew a map which substantially achieved population equality.

A second option would be to order an election at large, or to dismiss the court actions with the assumption that an election at large would be held. The basis for this option would be 2 U.S.C. § 2a(c)(5) (1976), passed in 1929, which reads: "Until a State is redistricted in the manner provided by the law thereof after any apportionment, ... if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large."

On the other hand, a statute subsequently enacted in 1967, 2 U.S.C. § 2c (1976), appears to prohibit at-large elections. It reads: "In each State entitled ... to more than one Representative ..., there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative ...." The difficulty results from the fact that neither section 2c nor its legislative history makes any reference to repealing section 2a(c)(5). Nevertheless we conclude that the later statute, section 2c, repealed section 2a(c)(5) by implication. We base this conclusion on several factors. First, nothing in section 2c suggests any limitation on its applicability. Second, the floor debate on section 2c [1] indicates that Congress intended to eliminate the possibility of at-large elections, including those in situations where the legislature had failed to enact a plan. The following comments, made by Senators Bayh and Baker, are enlightening:

> MR. BAKER: [2 U.S.C. § 2c] strictly provides in a straightforward manner that when there is more than one Member of the House of Representatives from a State, the State must be districted, and the Members may not run at large.
>
> ....
>
> MR. BAYH: ... Suppose a State legislature does not do it [redistrict]. Does the Senator not think that, to be consistent, we should say that the Federal court should not be permitted to reapportion a State and let all the legislators run at large?
>
> MR. BAKER: With respectful deference to my colleague, I think not; because I believe that you are then running afoul of the very problem that is created by occasional failure of State legislatures to adhere to the provisions of article I of the Constitution.

1967, Pub.L.No.90–196, 81 Stat. 581.

---

1. Section 2c was attached as a rider to a private immigration bill. Act of December 14,

. . . .

MR. BAYH: . . . I just wish to make one brief comment in summary, in light of the colloquy.

This will make it mandatory for all Congressmen to be elected by single-Member districts, whether the reapportionment is done by the State legislatures or by a Federal court.

MR. BAKER: That is my understanding. 113 Cong.Rec. 31718–20 (1967). Furthermore, the Senators made clear their distaste for at-large elections. Senator Bayh said: "[W]e know that if [Hawaii and New Mexico] are excluded from the overall coverage, it can pass the House and we can get a prohibition of at-large elections, which we all believe is necessary." *Id.* at 31719. Senator Baker said: "The concept of single-Member districts for a unique and special reason has been a nonpartisan undertaking by Members on both sides of the aisle." *Id.* at 34365.[2]

We realize that the court decisions which prompted Congress to enact section 2c were not based on the statute at issue here, section 2a(c)(5). Rather, those court decisions were based on section 2a(c)(1), which provides a remedy when a state fails to redistrict and there is not a change in the number of representatives. However, that remedy, maintenance of the old districts, would usually violate the one man-one vote rule of *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), because of population inequalities. *See* section V.A.1., *infra.* Nevertheless, we can see no reason to limit section 2c to the situation where there is a failure to reapportion but there is no change in the number of representatives. The plain language of section 2c suggests no such limitation. Furthermore, there is no reason to think that had Congress considered the situation where the number of representatives is decreased, it would have favored at-large elections in that context. The passages from the floor debate quoted above indicate opposition to at-large elections, rather than opposition to at-large elections prompted by *Wesberry.*

We also realize that "repeals by implication are not favored." *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Commission,* 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334 (1968). Nevertheless, such repeals are not unprecedented. *See Gordon v. New York Stock Exchange,* 422 U.S. 659, 685, 95 S.Ct. 2598, 2613, 45 L.Ed.2d 463 (1975). It is well settled that when a later statute is inconsistent with an earlier statute, the later one repeals the earlier. *United States v. Yuginovich,* 256 U.S. 450, 463, 41 S.Ct. 551, 554, 65 L.Ed. 1043 (1921); *United States v. Tynen,* 78 U.S. (11 Wall.) 88, 92, 20 L.Ed. 153 (1870); *see United States v. California,* 297 U.S. 175, 188, 56 S.Ct. 421, 426, 80 L.Ed. 567 (1936). Here, the plain language of section 2c is inconsistent with section 2a(c)(5), warranting a finding of repeal by implication.

Therefore, the only appropriate remedy is a court-ordered apportionment. The plan we have adopted is set forth in "Appendix A." We now explain the criteria we used in formulating the plan.

### V. Reapportionment Criteria

In drawing the district boundaries we are guided by the United States Constitution, the State of Missouri Constitution, state law, and sound judicial discretion. An explanation of the criteria we have used is in order.

### A. Federal Constitutional Requirements

#### 1. Population

Our first obligation is to follow the requirements of the United States Constitution. The only requirement that has expressly been found by the Supreme Court in congressional apportionment is that the population of the districts must be as equal as practicable.

The population standard for congressional districts was announced in *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The Court said: "We

---

2. For the entire floor debate, *see* 113 Cong.Rec. 31718–20, 34032–39, 34364–70 (1967).

hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* at 7–8, 84 S.Ct. at 529–30 (footnotes omitted). Five years later the Court elucidated the "as nearly as practicable" standard in *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). The Court declared: "[T]he command of Art. I, § 2, that States create congressional districts which provide equal representation for equal numbers of people permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Id.* at 531, 89 S.Ct. at 1229. *See also White v. Weiser,* 412 U.S. 783, 790–91, 93 S.Ct. 2348, 2352–53, 37 L.Ed.2d 335 (1973). The Court expressly rejected a *de minimis* standard for population deviation.[3] The Court has called population equality "the preeminent, if not the sole, criterion on which to adjudge constitutionality" in congressional reapportionment. *Chapman v. Meier,* 420 U.S. 1, 23, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975) (dictum).

■ The command of the Supreme Court is that there must be a reason for every deviation; the deviation must be either unavoidable with the available data, or there must be a permissible policy strong enough to justify the deviation.

The Court in *Preisler* specifically considered policies offered to justify deviations from the ideal. The following proffered justifications for population variances were found inadequate: (1) avoiding the fragmentation of political subdivisions, including counties and municipalities, (2) avoiding the fragmentation of distinct economic and social interests, (3) the give and take of the legislative process, and (4) compactness of districts. 394 U.S. at 533–36, 89 S.Ct. at 1230–31. The Court said projected population shifts would justify variances, but these projections must be capable of precise documentation. The Court assumed without deciding that districts could be based on the eligible voter population rather than the total population. If that method is chosen, however, it must be applied throughout the state and not be based on haphazard adjustments.[4]

In *Weiser,* the Supreme Court left open the possibility that a district court could deviate from the ideal population in an attempt to implement as much as possible a plan passed by the legislature. 412 U.S. at 795–97, 93 S.Ct. at 2354–55. There the Court ordered a district court to explain why it had not adopted an apportionment plan based on one passed by the legislature. *Id.* at 796–97, 93 S.Ct. at 2355–56. The plan adopted by the legislature had been found unconstitutional because the districts were not as equal in population as practicable. *Id.* at 788, 93 S.Ct. at 2351. The plan adopted by the court disregarded the one passed by the legislature. *Id.* at 787, 93 S.Ct. at 2351. However, the plan adopted by the court did not achieve population equality as well as the one based on the legislature's plan. *Id.* at 796, 93 S.Ct. at 2355. Therefore, *Weiser* does not stand for the proposition that implementation of a legislative plan is more important than population equality. Furthermore, four Justices concurred solely on the population equality issue. *Id.* at 798, 93 S.Ct. at 2356 (Powell, J., concurring, joined by Burger, C. J., and Rehnquist, J.), *id.* (Marshall, J., concurring in part.)

In applying the "one man-one vote" rule, we have concentrated solely on population equality. The 1980 decennial census shows

---

**3.** The Court has put state legislature apportionment schemes to a less exacting scrutiny. The unconstitutionality of population variances in state legislative districts is based on the equal protection clause of the Fourteenth Amendment, not Art. I, § 2. *See, e.g., White v. Regester,* 412 U.S. 755, 763, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973).

**4.** We note that the finding by the *Preisler* Court, that proffered justifications for population deviation were inadequate, did not imply that these considerations were illegitimate. The Court did not suggest that political subdivisions or economic and social interests cannot be considered; rather, these factors must be secondary to population equality.

that Missouri has a population of 4,916,686, making the mathematical ideal for each district 546,298. We drew boundaries which give the districts populations as close as possible to equal, and we received assistance from demographic experts[5] to bring the population even closer to the ideal. Only one district deviates from the ideal by more than one-tenth of one percent. The variance between the largest and smallest districts is 0.18%. The average variance is 0.054%. We did not consider possible justifications for a population variance because of the lack of reliable data to show population shifts and uncertainty as to what other policies can justify variance.

The plan we are adopting achieves population equality better than any plan submitted to this court and, so far as we can determine, better than any plan proposed in the legislature. The plan suggested by the dissent has a variance between the largest and smallest districts of 1.17%, more than six times as great as that in the plan we have adopted. The average variance is 0.34%, also more than six times as great as in the court plan. Only two of the districts in the dissent's plan (Sixth and Seventh) have a variance smaller than that in the district with the greatest deviation in the majority plan (Fifth). Unless there is a justification for these deviations, the dissent's plan is not constitutional because it does not create districts with populations as equal as is practicable.

■ The dissent does not address this constitutional requirement, but two possible justifications for the population variances can be read into the dissenting opinion. The first is that the variances resulted from an attempt not to split counties. See p. 948, par. 2, post. Although we agree that this is desirable, at least in rural counties, because it contributes to the efficient administration of elections, see p. 933, infra, it must be secondary to achieving population equality. *Kirkpatrick v. Preisler*, 394

U.S. at 533–34, 89 S.Ct. at 1230. The other possible justification is that the variance resulted from implementing a legislative plan. See pp. 947–948, post. Even if *Weiser* would allow a variance for that reason, a proposition not at all clear, p. 928, supra; *In re: Illinois Congressional Districts Reapportionment Cases,* No. 81 C 3915, slip op. at 12 (N.D.Ill. Nov. 23, 1981), appeal docketed, Nos. 81–1068 and 81–1077 (U.S. Dec. 9 and 10, 1981), it would not apply to the dissent's plan. *Weiser* dealt with a plan approved by the legislature and later found to be unconstitutional. The dissent's plan is a proposal that was not adopted by either the House or the Senate in the General Assembly. Such a plan can hardly be said to demonstrate any legislative intent other than a rejection of the plan.

■ The constitutional requirement is that population be as nearly equal as is practicable, and we have achieved this better than any other plan that has been presented to the court or considered by the General Assembly. Because of the population equality requirement, discussion of rewards or punishments for population changes in the old districts is irrelevant.

2. Race

The Supreme Court has also discussed the requirements of the Fourteenth and Fifteenth Amendments regarding minority voting rights. Although these cases have usually dealt with noncongressional apportionment, the questions they raise might be applicable to congressional apportionment, and therefore they deserve our consideration.

■ The Supreme Court has held that only purposeful discrimination or abridgment of the vote violates the Fifteenth Amendment or the equal protection clause of the Fourteenth Amendment. *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct.

---

**5.** The demographers of the State of Missouri Office of Administration, Division of Budget and Planning, and in particular Mark R. Reading, Project Director for Reapportionment, and T. Ryan Burson, Planner.

We are indebted to these gentlemen and the state agency they represent for their technical assistance in checking the population figures of the 1980 decennial census and the boundary locations of the various districts.

1490, 64 L.Ed.2d 47 (1980). Although the opinion of the Court was only a four-justice plurality, Justice Stevens concurred on the basis that even invidious discrimination would not necessarily be unconstitutional, *id.* at 94, 100 S.Ct. at 1514, and Justice White dissented on the grounds that purposeful discrimination was not proved. *Id.* at 103, 100 S.Ct. at 1520. Only two Justices, Brennan and Marshall, felt that discriminatory impact would make out a constitutional violation. *Id.* at 94, 100 S.Ct. at 1514 (Brennan, J., dissenting), 103, 100 S.Ct. at 1520 (Marshall, J., dissenting). Thus it is clear that we are under no constitutional duty to draw a black-majority district.[6] This explanation of our criteria dispels any notion that a possible adverse impact on blacks is based on a discriminatory motive.

 On the other hand, race can constitutionally be considered. This principle can be discerned from the opinions in *United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Justices White, Stevens, and Rehnquist said that districts with black majorities can deliberately be drawn so long as white voting strength is not unfairly cancelled out. *Id.* at 165–68, 97 S.Ct. at 1009–11.[7] Justices Stewart and Powell, concurring in the judgment, said that a racial criterion is not unconstitutional *per se. Id.* at 179–80, 97 S.Ct. at 1016–17.[8] Although lacking a majority opinion, a majority of the Justices in *U.J.O.* rejected the idea that the Constitution requires color-blind redistricting.

Three months after the *U.J.O.* decision was announced, the Court suggested in dicta the extent to which a district court must consider race in redistricting. In *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977), the Court remanded a state legislative apportionment to a three-judge court because of population variances. The plan was also challenged as diluting black voting strength. The Supreme Court said in dicta that a court must explain departures from neutral guidelines if the departures have an adverse impact on black voting strength. In order to dispel any notion of invidious discrimination, we have not departed from neutral guidelines.

The bottom line as to our duty regarding black voting strength is that we cannot intentionally dilute it, we can—but need not—intentionally preserve it, and we probably cannot intentionally enhance it to the detriment of other groups' voting strength.

We have not attempted to divide Missouri's present black-majority district (the First). Instead, we have increased its geographic size to bring the population to the required amount. We drew a compact district by extending it to natural boundaries (the Missouri River/St. Louis County line on the north and Interstate Highway 44 on the south, connected by a line on the west that runs north-south which generally follows municipal boundaries or census tracts). This neutral approach achieves maximum compactness in the First district and also makes the Second district more compact by not wrapping it around the First district.

6. In *City of Mobile,* the plaintiffs alleged that Mobile's at-large elections with multi-member districts for city commissioners prevented the election of blacks. We can discern no reason why discriminatory impact would make out a constitutional violation in the context of congressional apportionment.

7. In the instant case, there is no danger of cancelling out white voting strength. If one black-majority district were drawn, it would give 11.1 percent of the Missouri congressional districts a black majority. Blacks comprise 10.5 percent and all nonwhites comprise 11.6 percent of the Missouri population. A comparison of the percentage of black-majority districts to the percentage of the black population is a proper way of determining whether use of

racial criteria has cancelled out a group's voting strength. *See United Jewish Organizations v. Carey,* 430 U.S. at 166, 97 S.Ct. at 1010.

8. Justices Brennan and Blackmun felt that a racial criterion in *U. J. O.* was permissible because of the applicability of the Voting Rights Act of 1965. They joined the part of Justice White's opinion relying on the Voting Rights Act, 430 U.S. at 155–65, 97 S.Ct. at 1004–09, but they did not join the part which said that race could be considered absent the Act. *Id.* at 168–79, 97 S.Ct. at 1011–17 (Brennan, J., concurring). Justice Marshall took no part in the case, and Chief Justice Burger was the lone dissenter.

This neutral approach comports with constitutional requirements.

### 3. Other Constitutional Criteria

Finally, there is a question as to whether it is constitutional to intentionally discriminate against nonracial voting groups such as religious, ethnic, economic, or political groups. *See City of Mobile v. Bolden*, 446 U.S. at 86, 100 S.Ct. at 1510. (Stevens, J., concurring); *Bush v. Martin*, 224 F.Supp. 499, 510 (S.D.Tex.1963), *aff'd*, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964), and cases cited therein. We need not resolve the question of the constitutionality of discrimination against these groups because we are not deviating from neutral standards.

### B. Missouri Constitutional Requirements

The next legal standard is that imposed by the Missouri Constitution: "[Congressional] districts shall be composed of contiguous territory as compact and as nearly equal in population as may be." Mo.Const. art. 3, § 45. We respect the additional standard of compactness as a matter of law as well as of comity.[9] *White v. Weiser*, 412 U.S. at 795, 93 S.Ct. at 2354; *Preisler v. Secretary of State*, 341 F.Supp. at 1161; *see Reynolds v. Sims*, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964).

Determining whether a particular plan meets the state requirements can be difficult. No state appellate court has interpreted the words "compact" and "contiguous" in this section. We therefore look to the construction of those word in the sections of the constitution relating to apportionment of the Missouri House of Representatives, Mo.Const. art. 3, § 2, and the Senate. *Id.* at § 5. Although there are no appellate cases construing the words relating to the House, there are cases which have construed them regarding state Senate apportionment. The Missouri Supreme Court has read the words as prohibiting "gerrymandering," long and narrow strips,

and "branches," while requiring districts to be composed of "closely united territory." *Preisler v. Doherty*, 365 Mo. 460, 284 S.W.2d 427, 433–35 (1955). *See also State v. Hitchcock*, 241 Mo. 433, 146 S.W. 40 (1912). In both of these cases, apportionment plans were invalidated. 284 S.W.2d at 437; 146 S.W. at 65.

Neither of these cases, nor others construing the words, *see, e.g., Preisler v. Kirkpatrick*, 528 S.W.2d 422 (Mo. banc 1975); *Preisler v. Hearnes*, 362 S.W.2d 552 (Mo. banc 1962), gives us guidance as to the outer limits of compactness and contiguity, although they do indicate a willingness on the part of Missouri courts to invalidate plans for failure to meet these standards. Furthermore, we do not know whether those words would be given an identical meaning as related to congressional apportionment.

■ It is important that our plan adhere to the requirements of the Missouri Constitution; if it were to be invalidated by a state court because it failed to meet the compactness requirement, the state would be in a quagmire regarding the election of its congressional representatives. Just the existence of lengthy litigation on the issue would be harmful. While we cannot prevent litigation, we can endeavor to lessen the probability of legal challenges by adhering to state constitutional and legal requirements where such requirements do not intrude on the commands of the United States Constitution. In fact, we are obligated to do so. *White v. Weiser*, 412 U.S. at 795, 93 S.Ct. at 2354.

Therefore, we strived not simply for legally sufficient compact and contiguous districts; we drew the most compact and contiguous districts we could, given the considerations involved and the weight of the various factors that go to make up the equation. We drew compact districts by blocking a district out from each of the four corners of the state until the proper popula-

9. The requirement of population equality is subsumed in the requirement of the United States Constitution.

tion was reached, by concentrating one district in the Kansas City area,[10] and by concentrating three districts in four counties in the St. Louis area, where there are 149,610 people more than enough for three districts.[11] The last district is composed of the remaining area in the western part of the state. Complete compactness is lacking only because of our desire not to split rural counties, p. 933, *infra*, while achieving population equality.

On the other hand, the dissent's plan is not compact. A "finger" in the Eighth district probes into St. Louis County to secure approximately 144,000 of the required population. There are unnecessary irregular lines between the Ninth and Second districts as the Ninth dips into two separate parts of St. Louis County. We do not think it is proper for a federal court to give so little regard to the state constitutional requirement of compactness when that requirement does not conflict with federal law.

C. Policy Considerations

Within these legal constraints there are, of course, many plans which could be devised. We now set forth those criteria which we believe are most appropriate for a court.

1. Legislative Practices

Because reapportionment is primarily a legislative function, we must follow the policies and preferences of the state in fashioning an apportionment plan. *Connor v. Finch*, 431 U.S. at 414–15, 97 S.Ct. at 1833–34; *White v. Weiser*, 412 U.S. at 795, 93 S.Ct. at 2354, and cases cited therein. We did not want to intrude upon state policies any more than necessary to meet constitutional requirements. *Whitcomb v. Chavis*, 403 U.S. 124, 160–61, 91 S.Ct. 1858, 1877–78, 29 L.Ed.2d 363 (1971). Adhering

to state policies is a way in which we can give effect to the will of the majority of the people of Missouri. *Preisler v. Secretary of State*, 341 F.Supp. at 1161. Other than the state constitution's compact and contiguous requirements, state policies are difficult to discern. Following them is not required by state law, so we have given the compact and contiguous requirements preeminence over all other state policies.

The state legislature's own work on apportionment can be indicative of state policy. When a state enacts apportionment legislation which is later declared unconstitutional, a court which fashions a remedy by drawing its own plan should follow the legislature's version as much as is constitutionally possible. *White v. Weiser*, 412 U.S. at 795–97, 93 S.Ct. at 2354–55; *Preisler v. Secretary of State*, 341 F.Supp. at 1161. In the instant case, however, we are being asked to apportion because no bill has been passed.

As an alternative, we could look to legislative proposals to attempt to discern a state policy. The further a bill goes in the legislative process (*e.g.*, out of committee, passed by one house, passed by both houses but vetoed) the more it evidences a legislative policy. *See Skolnick v. State Electoral Board*, 336 F.Supp. 839, 846 (N.D. Ill.1971). On the other hand, the failure of a bill to be enacted evidences a legislative policy that the bill is not desired by the legislature. Therefore, we cannot simply embrace as our own the bill that went the furthest or that experts believe would have or could have passed. Such action would be a massive intrusion into the legislative process. We would, in effect, be amending the rules for enacting legislation. Although political scientists may argue over the extent to which the legislative process reflects the will of the people, we must take the procedures as we find them.

10. The population of the five counties in the Missouri portion of the Census Bureau's Standard Metropolitan Statistical Area for Kansas City is 884,502, which is more than enough for one district.

11. The population of the five counties in the Missouri portion of the Census Bureau's Standard Metropolitan Statistical Area for St. Louis is 1,788,504, while 1,638,894 people are needed to completely fill three districts. One of the counties in the SMSA, Franklin County, is not included in any of the St. Louis area districts.

This does not mean that all legislative proposals are useless. To the extent the proposals which came closest to passing have common elements, we have tried to incorporate those elements into our plan. However, plans considered by the General Assembly were so different from one another that extracting common elements is difficult. Furthermore, even when some general common elements can be discerned, they are hard to apply. The specific application of these elements will often have ramifications on the entire plan, which caused the dispute and present stalemate in the General Assembly.

■■■ Another indication of a state policy is the state's historical practices regarding apportionment. *See Connor v. Finch*, 431 U.S. at 419, 424, 97 S.Ct. at 1836, 1838. We have adhered to these practices to the extent possible. However, these practices are not always easy to discern or apply.

Prior apportionments are of little help. Missouri was divided into ten districts under the 1970 census. Legislative debate has centered on where to eliminate a district. The old plan, therefore, is of little help. Furthermore, that plan was drafted by a court, reducing its usefulness for reflecting legislative intent.[12]

■■■ One historical practice is that of not bisecting rural counties. Although this goal is secondary to population equality, *Kirkpatrick v. Preisler*, 394 U.S. at 533–34, 89 S.Ct. at 1230–31, we feel we can reasonably adhere to this practice. Respecting political subdivisions is a proper judicial approach to apportionment. *Skolnick v. State Electoral Board*, 336 F.Supp. at 843.

We are also mindful of the admonition of the Supreme Court in *Kirkpatrick v. Preisler*, 394 U.S. at 533–34, 89 S.Ct. at 1230: "[W]e do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county, municipal, or other political subdivision boundaries." However, we have attempted to not disturb county boundaries except where necessary to achieve approximate equality of population, because all of the evidence adduced in the case was that the splitting of counties can cause innumerable administrative problems and additional costs in holding elections, along with confusion among voters in the split counties. While we read the Supreme Court cases as being basically concerned with population and as demanding a population distribution as near to the quotient as is practicably possible under the prevailing circumstances, we do believe that minor deviations based on preserving definitive county and political subdivisions are permissible within very narrow limits.

We also note that historically the City of St. Louis has been divided into two districts. We realize that until the 1980 census, the official population of the City of St. Louis was greater than that necessary for one congressional district. However, in the past both districts in the City of St. Louis extended into St. Louis County, indicating that more than numerical necessity caused the division. Legislative proposals conflicted on whether to divide the City of St. Louis. This is unfortunate, because whether or not the city is divided has almost no ramifications on the rest of the plan, and therefore if legislative proposals had been in agreement we could have adopted the approach in these proposals. Because the proposals conflict on this issue, we rely on the previous state policy of dividing the City of St. Louis. We chose as the dividing line a "natural" boundary, an interstate highway near the center of the city.[13]

We realize that we could be criticized for dividing the City of St. Louis in light of its population. The city's population is 453,-

---

12. The court did, however, base its plan on one which had been enacted by the legislature but was found unconstitutional. *Preisler v. Secretary of State*, 341 F.Supp. at 1161.

13. It is ironic that the dissent bases its plan on a desire to salvage the present districts, p. 948, par. 1, *post*, but it does not salvage that part of the plan which divides the City of St. Louis.

085, which is 93,213 less than enough for one district. If the city were not divided, it would have 83% of the population of the district in which it is located. Dividing the City of St. Louis has given it a minority of the population in two districts (48% in the First and 35% in the Third). Arguably, its vote has been diluted. Nevertheless, we are not interested in preserving or diluting a particular area's strength. We have divided the City of St. Louis because of the prior state policy of doing so.

## 2. Other policies

Because state policies as to apportionment are largely inconclusive, we are guided primarily by equality of population and compactness.

We have given consideration to the expressions of political and civic bodies and individuals which have been brought to the attention of this court. Of course, sentiment may conflict within a community and between communities, limiting the usefulness of such expressions.

■ The divergent interests which are most directly reflected in geographic distributions are those between rural and urban areas. We do not mean to suggest that all rural interests are identical; rather, we believe that the differences among various rural interests are less than the differences between any rural interest and an urban interest. These varied interests are secondary to the compactness requirement of the Missouri Constitution. Indeed, grouping of urban interests is to some extent necessary to meet the compactness requirement.

Census figures show that the population of the St. Louis Standard Metropolitan Statistical Area is 1,788,504, or 149,610 more than enough to completely fill three districts. The population of the Kansas City Standard Metropolitan Statistical Area is 884,502, or 338,204 more than enough for one district, and 208,094 less than enough to completely fill two districts. There would be no reason to have fewer than four completely urban districts, or 44.4 percent of the districts. The urban population of Missouri is 54.4 percent of the state's population, and five urban districts would give the urban areas 55.6 percent of the representatives.

## D. Summary

Our criteria in reapportionment are, in order of importance: (1) achieving population equality, (2) drawing compact and contiguous districts, and (3) implementing state policies on apportionment, including not bisecting rural counties.

### VI. Conclusion

We regret that we were unable to reach a unanimous decision. However, the plan espoused by our esteemed brother does not comport with the federal constitutional requirement of population equality and does not appear to comply with the Missouri constitutional requirement of compactness. We therefore adopt the plan appended to this opinion and marked "Appendix A." The 1980 census population figures of the judicially approved congressional districts are as follows:

UNITED STATES CONGRESSIONAL DISTRICTS

| DISTRICT | POPULATION | VARIANCE FROM IDEAL DISTRICT | |
| --- | --- | --- | --- |
| | | POPULATION | PERCENT |
| 1 | 546,208 | 90 | .02% |
| 2 | 546,039 | 259 | .05% |
| 3 | 546,102 | 196 | .04% |
| 4 | 546,637 | 339 | .06% |
| 5 | 546,882 | 584 | .11% |
| 6 | 546,614 | 316 | .06% |
| 7 | 545,921 | 377 | .07% |

| DISTRICT | POPULATION | VARIANCE FROM IDEAL DISTRICT | |
|---|---|---|---|
| | | POPULATION | PERCENT |
| 8 | 546,112 | 186 | .03% |
| 9 | 546,171 | 127 | .02% |

State
Population 4,916,686

Ideal district population: 546,298

Largest district: District 5 546,882

Smallest district: District 7 545,921

Average percent variance of districts from ideal size: .05%

Variance between smallest and largest district: .18%

For the foregoing reasons, it is OR-DERED, ADJUDGED, AND DECLARED that the congressional apportionment set forth in *Preisler v. Secretary of State*, 341 F.Supp. 1158 (W.D.Mo.1972), is unconstitutional. It is further

ORDERED AND ADJUDGED that congressional election processes and congressional primary and general elections in 1982 and thereafter be conducted in and from the congressional districts established in this judgment and by Appendix A unless and until a timely new congressional redistricting act enacted by the State of Missouri takes effect. In the event there is a conflict in Appendix A between, on the one hand, the census tract and county descriptions, and, on the other, the boundary lines as shown on the appended maps, the maps shall control. In particular, the line between the First and Third districts is the middle of the present location of Interstate Highway 44, and after it reaches Interstate Highway 55 in the eastern part of the city, the center of Interstate Highway 55 is the dividing line. The State of Missouri Office of Administration shall provide the Secretary of State with maps which detail the maps set forth in Appendix A. It is further

ORDERED AND ADJUDGED that this court retain jurisdiction to implement, enforce, and amend this judgment as shall be meet and just and in accordance with the 1980 census figures.

APPENDIX "A"

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

CENTRAL DIVISION

In Civil Actions No. 81–4144, 81–4180, 81–4196, and 81–4184, the court's redistricting plan for Missouri is set forth in words and figures, as follows:

CONGRESSIONAL DISTRICT NUMBER 1

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| St. Louis County (part) | |
| Census Tract 2101 | 6,622 |
| Census Tract 2102 | 6,899 |
| Census Tract 2103 | 4,153 |
| Census Tract 2104 | 4,191 |
| Census Tract 2105 | 9,971 |
| Census Tract 2106 | 7,513 |
| Census Tract 2107 | 14,445 |
| Census Tract 2108.02 | 14,620 |
| Census Tract 2108.03 | 5,194 |
| Census Tract 2108.04 | 7,065 |
| Census Tract 2109.01 | 6,890 |
| Census Tract 2117 | 4,559 |
| Census Tract 2118 | 9,605 |
| Census Tract 2119 | 5,593 |
| Census Tract 2120 | 12,358 |
| Census Tract 2121 | 9,279 |
| Census Tract 2122 | 10,695 |
| Census Tract 2123 | 5,627 |
| Census Tract 2124 | 2,711 |

| | 1980 POPULATION |
|---|---|
| Census Tract 2125 | 5,427 |
| Census Tract 2126 | 5,066 |
| Census Tract 2127 | 9,779 |
| Census Tract 2136 | 6,088 |
| Census Tract 2137 | 7,352 |
| Census Tract 2138 | 8,847 |
| Census Tract 2139 | 2,874 |
| Census Tract 2140 | 1,183 |
| Census Tract 2141 | 1,971 |
| Census Tract 2142 | 4,236 |
| Census Tract 2143 | 4,803 |
| Census Tract 2157 | 7,733 |
| Census Tract 2158 | 7,546 |
| Census Tract 2159 | 9,120 |
| Census Tract 2160 | 2,363 |
| Census Tract 2161 | 6,966 |
| Census Tract 2162 | 9,010 |
| Census Tract 2163 | 5,577 |
| Census Tract 2164 | 5,576 |
| Census Tract 2165 | 3,408 |
| Census Tract 2167 | 4,529 |
| Census Tract 2168 | 4,103 |
| Census Tract 2169 | 2,823 |
| Census Tract 2170 | 3,810 |
| Census Tract 2171 | 1,372 |
| Census Tract 2172 | 2,955 |
| Census Tract 2173 (part) | |
| Jefferson Township (part) | |
| Brentwood (part) | |
| Block Group 1 | 521 |
| Block Group 2 | 797 |
| Block Group 3 (part) | |
| Blocks 301–302 | 63 |
| Blocks 307–312 | 293 |
| Block Group 4 | 997 |
| St. Louis City (part) | |
| Census Tract 1034 (part) | |
| Block Group 1 (part) | |
| Blocks 117–118 | 63 |
| Block Group 3 (part) | |
| Block 320 | 17 |
| Census Tract 1036 (part) | |
| Block Group 1 (part) | |
| Blocks 104–120 | 277 |
| Census Tract 1038 (part) | |
| Block Group 5 (part) | |
| Block 522 | 0 |
| Census Tract 1039 (part) | |
| Block Group 1 | 381 |
| Block Group 2 | 407 |
| Block Group 3 (part) | |
| Blocks 307–324 | 466 |
| Blocks 344–348 | 87 |
| Census Tract 1041 | 3,462 |

| | 1980 POPULATION |
|---|---|
| Census Tract 1042 | 4,325 |
| Census Tract 1045 | 2,817 |
| Census Tract 1051 | 4,286 |
| Census Tract 1052 | 2,871 |
| Census Tract 1053 | 4,013 |
| Census Tract 1054 | 3,564 |
| Census Tract 1055 | 6,296 |
| Census Tract 1061 | 5,854 |
| Census Tract 1062 | 4,129 |
| Census Tract 1063 | 5,346 |
| Census Tract 1064 | 4,863 |
| Census Tract 1065 | 5,020 |
| Census Tract 1066 | 4,353 |
| Census Tract 1067 | 5,847 |
| Census Tract 1071 | 1,272 |
| Census Tract 1072 | 2,779 |
| Census Tract 1073 | 8,902 |
| Census Tract 1074 | 6,112 |
| Census Tract 1075 | 5,550 |
| Census Tract 1076 | 3,845 |
| Census Tract 1077 | 5,700 |
| Census Tract 1081 | 4,144 |
| Census Tract 1082 | 3,154 |
| Census Tract 1083 | 2,684 |
| Census Tract 1084 | 1,348 |
| Census Tract 1085 | 1,069 |
| Census Tract 1096 | 5,846 |
| Census Tract 1097 | 7,592 |
| Census Tract 1101 | 5,619 |
| Census Tract 1102 | 5,254 |
| Census Tract 1103 | 5,092 |
| Census Tract 1104 | 5,046 |
| Census Tract 1105 | 4,103 |
| Census Tract 1111 | 4,341 |
| Census Tract 1112 | 4,517 |
| Census Tract 1113 | 3,869 |
| Census Tract 1114 | 4,625 |
| Census Tract 1115 | 2,909 |
| Census Tract 1121 | 4,055 |
| Census Tract 1122 | 4,017 |
| Census Tract 1123 | 4,345 |
| Census Tract 1124 | 4,487 |
| Census Tract 1135 (part) | |
| Block Group 2 (part) | |
| Block 209 | 91 |
| Block Group 5 (part) | |
| Blocks 503–505 | 125 |
| Block 521 | 186 |
| Block Group 6 (part) | |
| Block 610 | 0 |
| Blocks 620–623 | 98 |

| | 1980 POPULATION |
|---|---|
| Census Tract 1171 (part) | |
| Block Group 1 (part) | |
| Blocks 101–102 | 242 |
| Block Group 4 (part) | |
| Blocks 405–406 | 0 |
| Census Tract 1172 (part) | |
| Block Group 1 (part) | |
| Blocks 101–105 | 1,098 |
| Block 119 | 0 |
| Block Group 7 (part) | |
| Blocks 705–706 | 515 |
| Block 716 | 0 |
| Census Tract 1173 (part) | |
| Block Group 1 | 618 |
| Block Group 3 (part) | |
| Blocks 317–318 | 196 |
| Block 320 | 23 |
| Block Group 4 (part) | |
| Block 423 | 0 |
| Block Group 6 | 1,443 |
| Block Group 7 | 844 |
| Census Tract 1181 | 2,872 |
| Census Tract 1184 | 1,466 |
| Census Tract 1185 | 1,437 |
| Census Tract 1186 | 3,364 |
| Census Tract 1191 | 6,303 |
| Census Tract 1192 | 2,624 |
| Census Tract 1193 | 3,829 |
| Census Tract 1201 | 2,040 |
| Census Tract 1202 | 2,193 |
| Census Tract 1203 | 3,240 |
| Census Tract 1211 | 4,806 |
| Census Tract 1212 | 3,989 |
| Census Tract 1213 | 2,702 |
| Census Tract 1214 | 344 |
| Census Tract 1221 | 1,469 |
| Census Tract 1222 (part) | |
| Block Group 1 (part) | |
| Block 105 | 0 |
| Block 114 | 3 |
| Block 125 | 0 |
| Blocks 127–140 | 5 |
| Blocks 150–153 | 0 |
| Block Group 2 | 4 |
| Block Group 3 | 85 |
| Census Tract 1224 (part) | |
| Block Group 2 | 18 |
| Block Group 3 | 50 |
| Block Group 4 | 2,487 |
| Block Group 5 | 310 |
| Block Group 6 | 2,032 |
| Census Tract 1231 (part) | |
| Block Group 1 | 183 |
| Block Group 2 | 78 |
| Block Group 3 (part) | |
| Blocks 301–302 | 0 |
| Block 317 | 178 |
| Census Tract 1232 (part) | |
| Block Group 1 | 986 |

| | 1980 POPULATION |
|---|---|
| Block Group 2 (part) | |
| Blocks 202–203 | 31 |
| Blocks 220–221 | 72 |
| Block Group 3 (part) | |
| Blocks 305–306 | 116 |
| Block 316 | 59 |
| Block Group 4 | 419 |
| Census Tract 1234 (part) | |
| Block Group 2 | 120 |
| Block Group 3 (part) | |
| Block 301 | 7 |
| Block 305 | 0 |
| Block 331 | 0 |
| Census Tract 1255 | 2,323 |
| Census Tract 1256 | 1,127 |
| Census Tract 1257 | 3,340 |
| Census Tract 1266 | 4,620 |
| Census Tract 1267 | 3,205 |
| TOTAL | 546,208 |

# CONGRESSIONAL DISTRICT NUMBER 2

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| St. Charles County (part) | |
| Census Tract 3102 | 4,744 |
| Census Tract 3103 | 9,475 |
| Census Tract 3104 | 2,667 |
| Census Tract 3105 | 7,977 |
| Census Tract 3106 | 7,941 |
| Census Tract 3107 | 5,538 |
| Census Tract 3108 | 4,959 |
| Census Tract 3109 | 4,487 |
| Census Tract 3110 | 5,074 |
| Census Tract 3112 | 12,323 |
| St. Louis County (part) | |
| Census Tract 2109.02 | 12,736 |
| Census Tract 2109.03 | 9,427 |
| Census Tract 2110 | 9,352 |
| Census Tract 2111 | 12,883 |
| Census Tract 2112 | 10,149 |
| Census Tract 2113.01 | 8,330 |
| Census Tract 2113.02 | 6,836 |
| Census Tract 2113.03 | 14,978 |
| Census Tract 2114.01 | 5,158 |
| Census Tract 2114.02 | 2,019 |
| Census Tract 2115 | 4,586 |
| Census Tract 2116 | 7,800 |
| Census Tract 2128 | 4,744 |
| Census Tract 2129 | 5,539 |
| Census Tract 2130 | 856 |
| Census Tract 2131.01 | 8,798 |
| Census Tract 2131.02 | 3,206 |

| | 1980 POPULATION |
|---|---|
| Census Tract 2132.01 | 7,467 |
| Census Tract 2132.02 | 7,459 |
| Census Tract 2133 | 9,015 |
| Census Tract 2134 | 8,654 |
| Census Tract 2135 | 5,876 |
| Census Tract 2144 | 6,148 |
| Census Tract 2145 | 3,678 |
| Census Tract 2146 | 9,898 |
| Census Tract 2147 | 8,311 |
| Census Tract 2148 | 6,578 |
| Census Tract 2149 | 6,548 |
| Census Tract 2150.01 | 3,016 |
| Census Tract 2150.02 | 6,757 |
| Census Tract 2150.03 | 4,662 |
| Census Tract 2151.01 | 10,145 |
| Census Tract 2151.02 | 5,194 |
| Census Tract 2151.03 | 3,027 |
| Census Tract 2151.04 | 9,553 |
| Census Tract 2151.05 | 1,999 |
| Census Tract 2152.01 | 6,533 |
| Census Tract 2152.02 | 6,444 |
| Census Tract 2152.03 | 9,994 |
| Census Tract 2153.01 | 4,267 |
| Census Tract 2153.02 | 3,463 |
| Census Tract 2154 | 5,666 |
| Census Tract 2155 | 5,055 |
| Census Tract 2156 | 5,198 |
| Census Tract 2166 | 2,884 |
| Census Tract 2173 (part) | |
| Jefferson Township (part) | |
| Brentwood (part) | |
| Block Group 3 (part) | |
| Blocks 303–306 | 485 |
| Census Tract 2174 | 4,523 |
| Census Tract 2175 | 5,925 |
| Census Tract 2176 | 7,786 |
| Census Tract 2177.01 | 4,362 |
| Census Tract 2177.02 | 7,231 |
| Census Tract 2178.02 | 8,694 |
| Census Tract 2178.04 | 9,775 |
| Census Tract 2178.05 | 7,512 |
| Census Tract 2178.06 | 5,955 |
| Census Tract 2178.07 | 7,124 |
| Census Tract 2179.02 | 10,567 |
| Census Tract 2179.03 | 8,684 |
| Census Tract 2179.04 | 7,042 |
| Census Tract 2180.01 | 7,916 |
| Census Tract 2180.02 | 5,361 |

| | 1980 POPULATION |
|---|---|
| Census Tract 2181 | 3,279 |
| Census Tract 2182 | 4,505 |
| Census Tract 2183 | 4,408 |
| Census Tract 2184 | 9,080 |
| Census Tract 2185 | 4,985 |
| Census Tract 2186 | 2,848 |
| Census Tract 2187 | 1,728 |
| Census Tract 2188 | 6,035 |
| Census Tract 2189 | 6,098 |
| Census Tract 2193 (part) | |
| Jefferson Township (part) | |
| Webster Groves (part) | |
| Block Group 2 (part) | |
| Blocks 204–216 | 616 |
| Block Group 3 | 699 |
| Census Tract 2114.02 | 9,447 |
| Census Tract 2215 | 8,777 |
| Census Tract 2216 | 8,521 |
| **TOTAL** | **546,039** |

# CONGRESSIONAL DISTRICT NUMBER 3

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| Jefferson County | 146,183 |
| St. Louis County (part) | |
| Census Tract 2190 | 1,355 |
| Census Tract 2191 | 4,417 |
| Census Tract 2192 | 2,715 |
| Census Tract 2193 (part) | |
| Jefferson Township (part) | |
| Webster Groves (part) | |
| Block Group 1 | 764 |
| Block Group 2 (part) | |
| Blocks 201–203 | 186 |
| Census Tract 2194 | 5,941 |
| Census Tract 2195 | 6,538 |
| Census Tract 2196 | 5,071 |
| Census Tract 2197 | 6,502 |
| Census Tract 2198 | 8,264 |
| Census Tract 2199 | 6,655 |
| Census Tract 2200 | 9,546 |
| Census Tract 2201 | 9,200 |
| Census Tract 2202 | 7,492 |
| Census Tract 2203 | 1,743 |
| Census Tract 2204.02 | 10,557 |
| Census Tract 2204.03 | 9,885 |
| Census Tract 2204.04 | 12,343 |

| | 1980 POPULATION |
|---|---|
| Census Tract 2205 | 13,860 |
| Census Tract 2206.01 | 5,440 |
| Census Tract 2206.02 | 5,947 |
| Census Tract 2207.01 | 3,111 |
| Census Tract 2207.02 | 4,380 |
| Census Tract 2207.03 | 3,269 |
| Census Tract 2208.01 | 6,129 |
| Census Tract 2208.02 | 5,628 |
| Census Tract 2208.03 | 5,337 |
| Census Tract 2209 | 2,934 |
| Census Tract 2210 | 3,930 |
| Census Tract 2211 | 1,851 |
| Census Tract 2212.01 | 2,248 |
| Census Tract 2212.02 | 5,955 |
| Census Tract 2213.01 | 7,541 |
| Census Tract 2213.02 | 6,742 |
| Census Tract 2213.03 | 8,640 |
| Census Tract 2214.01 | 5,748 |
| St. Louis City (part) | |
| Census Tract 1011 | 3,270 |
| Census Tract 1012 | 3,756 |
| Census Tract 1013 | 4,966 |
| Census Tract 1014 | 3,447 |
| Census Tract 1015 | 4,116 |
| Census Tract 1018 | 4,260 |
| Census Tract 1018.99 | 50 |
| Census Tract 1021 | 3,035 |
| Census Tract 1022 | 7,127 |
| Census Tract 1023 | 2,274 |
| Census Tract 1024 | 2,648 |
| Census Tract 1025 | 2,248 |
| Census Tract 1031 | 3,621 |
| Census Tract 1034 (part) | |
| Block Group 1 (part) | |
| Blocks 101–116 | 970 |
| Block Group 2 | 963 |
| Block Group 3 (part) | |
| Block 301 | 120 |
| Block 319 | 156 |
| Block 321 | 49 |
| Census Tract 1036 (part) | |
| Block Group 1 (part) | |
| Block 121 | 96 |
| Block Group 2 | 470 |
| Block Group 3 | 864 |
| Census Tract 1037 | 3,171 |
| Census Tract 1038 (part) | |
| Block Group 1 | 795 |
| Block Group 2 | 961 |
| Block Group 3 | 749 |
| Block Group 4 | 912 |
| Block Group 5 (part) | |
| Blocks 506–521 | 684 |

| | 1980 POPULATION |
|---|---|
| Block 523 | 52 |
| Block Group 6 | 316 |
| Census Tract 1039 (part) | |
| Block Group 3 (part) | |
| Block 343 | 31 |
| Census Tract 1131 | 4,385 |
| Census Tract 1134 | 1,185 |
| Census Tract 1135 (part) | |
| Block Group 1 | 142 |
| Block Group 2 (part) | |
| Blocks 201–208 | 662 |
| Block Group 3 | 716 |
| Block Group 4 | 657 |
| Block Group 5 (part) | |
| Blocks 509–511 | 179 |
| Blocks 522–524 | 210 |
| Block Group 6 (part) | |
| Blocks 607–608 | 87 |
| Census Tract 1141 | 9,590 |
| Census Tract 1142 | 5,569 |
| Census Tract 1143 | 6,449 |
| Census Tract 1151 | 3,942 |
| Census Tract 1152 | 3,172 |
| Census Tract 1153 | 6,358 |
| Census Tract 1154 | 3,327 |
| Census Tract 1155 | 6,331 |
| Census Tract 1156 | 6,116 |
| Census Tract 1157 | 4,390 |
| Census Tract 1161 | 3,338 |
| Census Tract 1162 | 5,937 |
| Census Tract 1163 | 7,169 |
| Census Tract 1164 | 5,379 |
| Census Tract 1165 | 5,295 |
| Census Tract 1171 (part) | |
| Block Group 1 (part) | |
| Blocks 103–109 | 624 |
| Block Group 2 | 672 |
| Block Group 3 | 764 |
| Block Group 4 (part) | |
| Blocks 401–404 | 0 |
| Census Tract 1172 (part) | |
| Block Group 1 (part) | |
| Blocks 108–109 | 439 |
| Block Group 2 | 874 |
| Block Group 3 | 954 |
| Block Group 4 | 1,255 |
| Block Group 5 | 1,406 |
| Block Group 6 | 1,411 |
| Block Group 7 (part) | |
| Blocks 701–702 | 223 |
| Census Tract 1173 (part) | |
| Block Group 3 (part) | |
| Blocks 301–307 | 470 |
| Block 319 | 30 |
| Block 321 | 103 |
| Block Group 4 (part) | |
| Blocks 407–422 | 606 |

| | | 1980 POPULATION |
|---|---|---|
| Block | 424 | 171 |
| Census Tract 1174 | | 5,576 |
| Census Tract 1222 (part) | | |
| Block Group 1 (part) | | |
| Blocks 102–103 | | 0 |
| Blocks 109–113 | | 0 |
| Blocks 116–124 | | 0 |
| Block | 154 | 9 |
| Census Tract 1224 (part) | | |
| Block Group 1 | | 0 |
| Census Tract 1231 (part) | | |
| Block Group 3 (part) | | |
| Blocks 304–307 | | 573 |
| Blocks 318–320 | | 278 |
| Block Group 4 | | 1,255 |
| Block Group 5 | | 270 |
| Block Group 6 | | 305 |
| Block Group 7 | | 1,280 |
| Census Tract 1232 (part) | | |
| Block Group 2 (part) | | |
| Block | 201 | 0 |
| Block | 205 | 0 |
| Blocks 207–210 | | 76 |
| Block | 219 | 0 |
| Block Group 3 (part) | | |
| Blocks 301–302 | | 268 |
| Block | 317 | 2 |
| Block Group 5 | | 835 |
| Census Tract 1233 | | 3,672 |
| Census Tract 1234 (part) | | |
| Block Group 1 | | 15 |
| Block Group 3 (part) | | |
| Blocks 312–321 | | 289 |
| Block | 332 | 106 |
| Block Group 4 | | 469 |
| Block Group 5 | | 372 |
| Block Group 6 | | 524 |
| Block Group 7 | | 296 |
| Block Group 8 | | 238 |
| Census Tract 1235 | | 0 |
| Census Tract 1241 | | 6,287 |
| Census Tract 1242 | | 4,526 |
| Census Tract 1243 | | 5,209 |
| Census Tract 1246 | | 2,561 |
| TOTAL | | 546,102 |

## CONGRESSIONAL DISTRICT NUMBER 4

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| Barton County | 11,292 |
| Bates County | 15,873 |
| Benton County | 12,183 |
| Camden County | 20,017 |
| Cass County | 51,029 |
| Cole County | 56,663 |

| | | 1980 POPULATION |
|---|---|---|
| Henry County | | 19,672 |
| Hickory County | | 6,367 |
| Jackson County (part) | | |
| Census Tract 113 (part) | | |
| Blue Township (part) | | |
| Independence (part) | | |
| Block Group 1 (part) | | |
| Blocks 116–136 | | 1,800 |
| Census Tract 114.01 (part) | | |
| Blue Township (part) | | |
| Independence (part) | | |
| Block Group 1 (part) | | |
| Blocks 101–102 | | 7 |
| Blocks 115–117 | | 241 |
| Block Group 9 | | 4,205 |
| Census Tract 114.03 (part) | | |
| Blue Township (part) | | |
| Independence (part) | | |
| Block Group 1 | | 2,706 |
| Block Group 2 | | 942 |
| Block Group 3 (part) | | |
| Blocks 301–308 | | 373 |
| Blocks 313–324 | | 2,730 |
| Block Group 9 | | 2,106 |
| Census Tract 114.04 | | 2,495 |
| Census Tract 135 (part) | | |
| Prairie Township (part) | | |
| Remainder of Township | | 184 |
| Census Tract 138 | | 3,870 |
| Census Tract 139 | | 5,889 |
| Census Tract 140 | | 7,243 |
| Census Tract 141.01 | | 5,050 |
| Census Tract 141.02 | | 11,825 |
| Census Tract 141.03 | | 8,188 |
| Census Tract 142.02 | | 197 |
| Census Tract 145 (part) | | |
| Blue Township (part) | | |
| Independence (part) | | |
| Block Group 9 (part) | | |
| Block | 907 | 1 |
| Block | 918 | 45 |
| Sni-A-Bar Township (part) | | 508 |
| Census Tract 147 | | 4,005 |
| Census Tract 148.01 | | 560 |
| Census Tract 148.02 | | 735 |
| Census Tract 149 | | 8,351 |
| Census Tract 150 (part) | | |
| Fort Osage Township (part) | | |
| Buckner (part) | | 1,133 |
| Levasy (part) | | 165 |
| Census Tract 151 (part) | | |
| Blue Township (part) | | |
| Independence (part) | | |
| Block Group 9 | | 288 |
| Sugar Creek (part) | | |
| Block Group 9 (part) | | |
| Block | 901 | 28 |
| Block | 908 | 34 |

| | 1980 POPULATION |
|---|---|
| Blocks 910–914 | 27 |
| Block 984 | 0 |
| Block 986 | 23 |
| Remainder of Township (part) | |
| Block Group 2 | 46 |
| Block Group 9 (part) | |
| Blocks 901–924 | 335 |
| Blocks 926–954 | 3,872 |
| Blocks 985–989 | 182 |
| Johnson County | 39,059 |
| Laclede County | 24,323 |
| Lafayette County | 29,925 |
| Maries County | 7,551 |
| Miller County | 18,532 |
| Moniteau County | 12,068 |
| Morgan County | 13,807 |
| Pettis County | 36,378 |
| Pulaski County | 42,011 |
| St. Clair County | 8,622 |
| Texas County | 21,070 |
| Vernon County | 19,806 |
| TOTAL | 546,637 |

## CONGRESSIONAL DISTRICT NUMBER 5

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| Jackson County (part) | |
| Census Tract 1 | 0 |
| Census Tract 2 | 50 |
| Census Tract 3 | 2,025 |
| Census Tract 4 | 811 |
| Census Tract 5.01 | 182 |
| Census Tract 5.02 | 1,263 |
| Census Tract 6 | 4,361 |
| Census Tract 7 | 4,023 |
| Census Tract 8 | 4,131 |
| Census Tract 9 | 3,632 |
| Census Tract 10 | 3,516 |
| Census Tract 11 | 1,948 |
| Census Tract 12 | 590 |
| Census Tract 13 | 1,619 |
| Census Tract 14 | 816 |
| Census Tract 15 | 1,437 |
| Census Tract 16 | 1,988 |
| Census Tract 17 | 2,746 |
| Census Tract 18 | 3,958 |
| Census Tract 19 | 3,943 |
| Census Tract 20 | 2,315 |
| Census Tract 21 | 4,886 |
| Census Tract 22 | 3,589 |

| | 1980 POPULATION |
|---|---|
| Census Tract 23 | 2,113 |
| Census Tract 24 | 1,399 |
| Census Tract 25 | 1,777 |
| Census Tract 26 | 28 |
| Census Tract 27 | 10 |
| Census Tract 28.01 | 80 |
| Census Tract 28.02 | 69 |
| Census Tract 29 | 1,212 |
| Census Tract 30 | 2,363 |
| Census Tract 31 | 175 |
| Census Tract 32 | 1,059 |
| Census Tract 33 | 1,543 |
| Census Tract 34 | 3,956 |
| Census Tract 35.01 | 1,723 |
| Census Tract 35.02 | 916 |
| Census Tract 36.01 | 1,212 |
| Census Tract 36.02 | 2,218 |
| Census Tract 37 | 2,207 |
| Census Tract 38 | 2,181 |
| Census Tract 39 | 1,716 |
| Census Tract 40 | 1,770 |
| Census Tract 41 | 989 |
| Census Tract 42 | 1,642 |
| Census Tract 43 | 2,925 |
| Census Tract 44 | 1,030 |
| Census Tract 45 | 969 |
| Census Tract 46 | 3,162 |
| Census Tract 47 | 1,201 |
| Census Tract 48 | 3,050 |
| Census Tract 49 | 2,686 |
| Census Tract 50 | 3,114 |
| Census Tract 51 | 2,256 |
| Census Tract 52 | 2,623 |
| Census Tract 53 | 2,398 |
| Census Tract 54 | 2,162 |
| Census Tract 55 | 1,927 |
| Census Tract 56.01 | 2,974 |
| Census Tract 56.02 | 3,138 |
| Census Tract 57 | 3,696 |
| Census Tract 58.01 | 3,880 |
| Census Tract 58.02 | 5,045 |
| Census Tract 59.01 | 954 |
| Census Tract 59.02 | 2,760 |
| Census Tract 60 | 2,480 |
| Census Tract 61 | 4,662 |
| Census Tract 62 | 2,211 |
| Census Tract 63 | 3,414 |
| Census Tract 64 | 2,773 |
| Census Tract 65 | 1,927 |

| Census Tract | 1980 POPULATION |
|---|---|
| Census Tract 66 | 2,185 |
| Census Tract 67 | 2,928 |
| Census Tract 68 | 1,004 |
| Census Tract 69 | 1,891 |
| Census Tract 70 | 3,209 |
| Census Tract 71 | 3,178 |
| Census Tract 72 | 2,149 |
| Census Tract 73 | 4,270 |
| Census Tract 74 | 4,678 |
| Census Tract 75 | 4,363 |
| Census Tract 76 | 4,307 |
| Census Tract 77 | 2,862 |
| Census Tract 78.01 | 1,094 |
| Census Tract 78.02 | 3,071 |
| Census Tract 79 | 5,682 |
| Census Tract 80 | 4,388 |
| Census Tract 81 | 3,418 |
| Census Tract 82 | 3,219 |
| Census Tract 83 | 2,721 |
| Census Tract 84 | 3,010 |
| Census Tract 85 | 3,581 |
| Census Tract 86 | 5,871 |
| Census Tract 87 | 3,963 |
| Census Tract 88 | 5,523 |
| Census Tract 89 | 2,828 |
| Census Tract 90 | 5,623 |
| Census Tract 91 | 4,269 |
| Census Tract 92 | 3,137 |
| Census Tract 93 | 2,794 |
| Census Tract 94 | 5,134 |
| Census Tract 95 | 3,885 |
| Census Tract 96 | 2,019 |
| Census Tract 97 | 1,140 |
| Census Tract 98 | 3,954 |
| Census Tract 99 | 2,714 |
| Census Tract 100.01 | 1,626 |
| Census Tract 100.02 | 2,973 |
| Census Tract 101.03 | 2,832 |
| Census Tract 101.04 | 777 |
| Census Tract 101.05 | 2,815 |
| Census Tract 101.06 | 2,715 |
| Census Tract 102.01 | 2,178 |
| Census Tract 102.03 | 5,084 |
| Census Tract 102.04 | 4,022 |
| Census Tract 103.01 | 655 |
| Census Tract 103.02 | 4,221 |
| Census Tract 104.01 | 1,441 |
| Census Tract 104.02 | 771 |
| Census Tract 105 | 5,835 |

| | 1980 POPULATION |
|---|---|
| Census Tract 106 | 3,428 |
| Census Tract 107.01 | 1,402 |
| Census Tract 107.02 | 2,415 |
| Census Tract 108.01 | 1,405 |
| Census Tract 108.02 | 4 |
| Census Tract 109.01 | 2,583 |
| Census Tract 109.02 | 900 |
| Census Tract 110 | 5,847 |
| Census Tract 111 | 4,170 |
| Census Tract 112 | 3,891 |
| Census Tract 113 (part) | |
| Blue Township (part) | |
| Independence (part) | |
| Block Group 1 (part) | |
| Blocks 102–109 | 1,475 |
| Block Group 2 | 1,391 |
| Block Group 3 | 542 |
| Census Tract 114.01 (part) | |
| Blue Township (part) | |
| Independence (part) | |
| Block Group 1 (part) | |
| Blocks 104–114 | 984 |
| Blocks 118–130 | 1,764 |
| Census Tract 114.03 (part) | |
| Blue Township (part) | |
| Independence (part) | |
| Block Group 3 (part) | |
| Blocks 310–311 | 176 |
| Census Tract 115 | 6,614 |
| Census Tract 116 | 5,824 |
| Census Tract 117 | 4,926 |
| Census Tract 118 | 5,638 |
| Census Tract 119 | 4,141 |
| Census Tract 120 | 3,776 |
| Census Tract 121 | 6,387 |
| Census Tract 122 | 6,380 |
| Census Tract 123 | 3,533 |
| Census Tract 124 | 4,401 |
| Census Tract 125.01 | 3,724 |
| Census Tract 125.02 | 3,079 |
| Census Tract 125.03 | 3,140 |
| Census Tract 126 | 5,197 |
| Census Tract 127.01 | 7,344 |
| Census Tract 127.02 | 636 |
| Census Tract 128.01 | 8,713 |
| Census Tract 128.02 | 3,371 |
| Census Tract 129.01 | 7,263 |
| Census Tract 129.02 | 5,406 |
| Census Tract 130.01 | 88 |
| Census Tract 130.02 | 2,266 |
| Census Tract 130.03 | 5,028 |
| Census Tract 131 | 3,582 |
| Census Tract 132.01 | 7,451 |

| | 1980 POPULATION |
|---|---|
| Census Tract 132.02 | 3,011 |
| Census Tract 133.01 | 4,404 |
| Census Tract 133.02 | 7,751 |
| Census Tract 133.03 | 5,168 |
| Census Tract 134.01 | 3,065 |
| Census Tract 134.02 | 5,629 |
| Census Tract 134.04 | 113 |
| Census Tract 134.05 | 1,369 |
| Census Tract 134.06 | 4,146 |
| Census Tract 135 (part) | |
| Prairie Township (part) | |
| Greenwood | 1,315 |
| Lee's Summitt (part) | 1,743 |
| Washington Township (part) | 212 |
| Census Tract 136 | 4,917 |
| Census Tract 137.01 | 1,078 |
| Census Tract 137.02 | 3,440 |
| Census Tract 137.03 | 5,266 |
| Census Tract 137.04 | 3,985 |
| Census Tract 142.01 | 3,335 |
| Census Tract 143 | 3,091 |
| Census Tract 144 | 1,704 |
| Census Tract 145 (part) | |
| Blue Township (part) | |
| Independence (part) | |
| Block Group 1 | 2,637 |
| Block Group 9 (part) | |
| Blocks 902–906 | 103 |
| Blocks 911–917 | 726 |
| Blocks 987–989 | 1,038 |
| Brooking Township (part) | |
| Kansas City (part) | 28 |
| Census Tract 146.01 | 6,486 |
| Census Tract 146.02 | 7,197 |
| Census Tract 151 (part) | |
| Blue Township (part) | |
| Independence (part) | |
| Block Group 1 | 0 |
| Sugar Creek (part) | |
| Block Group 9 (part) | |
| Block 915 | 0 |
| Blocks 919–920 | 16 |
| Blocks 925–926 | 7 |
| Remainder of Township (part) | |
| Block Group 9 (part) | |
| Block 925 | 4 |
| Blocks 955–956 | 2 |
| TOTAL | 546,882 |

# CONGRESSIONAL DISTRICT NUMBER 6

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| Andrew County | 13,980 |
| Atchison County | 8,605 |
| Buchanan County | 87,888 |
| Caldwell County | 8,660 |
| Carroll County | 12,131 |
| Chariton County | 10,489 |
| Clay County | 136,488 |
| Clinton County | 15,916 |
| Cooper County | 14,643 |
| Daviess County | 8,905 |
| DeKalb County | 8,222 |
| Gentry County | 7,887 |
| Grundy County | 11,959 |
| Harrison County | 9,890 |
| Holt County | 6,882 |
| Howard County | 10,008 |
| Jackson County (part) | |
| Census Tract 150 (part) | |
| Blue Township (part) | 240 |
| Fort Osage Township (part) | |
| Sibley | 382 |
| Remainder of Township | 1,373 |
| Linn County | 15,495 |
| Livingston County | 15,739 |
| Mercer County | 4,685 |
| Nodaway County | 21,996 |
| Platte County | 46,341 |
| Putnam County | 6,092 |
| Ray County | 21,378 |
| Saline County | 24,919 |
| Schuyler County | 4,979 |
| Sullivan County | 7,434 |
| Worth County | 3,008 |
| TOTAL | 546,614 |

# CONGRESSIONAL DISTRICT NUMBER 7

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| Barry County | 24,408 |
| Cedar County | 11,894 |
| Christian County | 22,402 |
| Dade County | 7,383 |
| Dallas County | 12,096 |
| Douglas County | 11,594 |
| Greene County | 185,302 |
| Jasper County | 86,958 |
| Lawrence County | 28,973 |
| McDonald County | 14,917 |
| Newton County | 40,555 |
| Ozark County | 7,961 |
| Polk County | 18,822 |

| | 1980 POPULATION |
|---|---|
| Stone County | 15,587 |
| Taney County | 20,467 |
| Webster County | 20,414 |
| Wright County | 16,188 |
| TOTAL | 545,921 |

## CONGRESSIONAL DISTRICT NUMBER 8

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| Bollinger County | 10,301 |
| Butler County | 37,693 |
| Cape Girardeau County | 58,837 |
| Carter County | 5,428 |
| Crawford County | 18,300 |
| Dent County | 14,517 |
| Dunklin County | 36,324 |
| Franklin County (part) | |
| Census Tract 8011 | 6,514 |
| Howell County | 28,807 |
| Iron County | 11,084 |
| Madison County | 10,725 |
| Mississippi County | 15,726 |
| New Madrid County | 22,945 |
| Oregon County | 10,238 |
| Pemiscot County | 24,987 |
| Perry County | 16,784 |
| Phelps County | 33,633 |
| Reynolds County | 7,230 |
| Ripley County | 12,458 |
| St. Francois County | 42,600 |
| Ste. Genevieve County | 15,180 |
| Scott County | 39,647 |
| Shannon County | 7,885 |
| Stoddard County | 29,009 |
| Washington County | 17,983 |
| Wayne County | 11,277 |
| TOTAL | 546,112 |

## CONGRESSIONAL DISTRICT NUMBER 9

Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

| | 1980 POPULATION |
|---|---|
| Adair County | 24,870 |
| Audrain County | 26,458 |
| Boone County | 100,376 |
| Callaway County | 32,252 |
| Clark County | 8,493 |
| Franklin County (part) | |
| Census Tract 8001 | 5,495 |
| Census Tract 8002 | 6,731 |
| Census Tract 8003 | 6,131 |
| Census Tract 8004 | 8,743 |
| Census Tract 8005 | 5,407 |
| Census Tract 8006 | 9,105 |
| Census Tract 8007 | 7,883 |
| Census Tract 8008 | 5,417 |
| Census Tract 8009 | 7,182 |
| Census Tract 8010 | 2,625 |
| Gasconade County | 13,181 |
| Knox County | 5,508 |
| Lewis County | 10,901 |
| Lincoln County | 22,193 |
| Macon County | 16,313 |
| Marion County | 28,638 |
| Monroe County | 9,716 |
| Montgomery County | 11,537 |
| Osage County | 12,014 |
| Pike County | 17,568 |
| Ralls County | 8,911 |
| Randolph County | 25,460 |
| St. Charles County (part) | |
| Census Tract 3101 | 4,364 |
| Census Tract 3111 | 16,045 |
| Census Tract 3113 | 11,325 |
| Census Tract 3114 | 7,050 |
| Census Tract 3115 | 729 |
| Census Tract 3116 | 4,380 |
| Census Tract 3117 | 8,711 |
| Census Tract 3118 | 5,153 |
| Census Tract 3119 | 6,521 |
| Census Tract 3120 | 4,192 |
| Census Tract 3121 | 4,464 |
| Census Tract 3122 | 5,988 |
| Scotland County | 5,415 |
| Shelby County | 7,826 |
| Warren County | 14,900 |
| TOTAL | 546,171 |

MISSOURI
1981
CONGRESSIONAL DISTRICTS

9

Route B

Dardenne Creek

Route V

94 Hwy

St. Charles County

Halls Ferry

Portage / Cave Spring twp line

Ehlman Rd

Spencer Rd

Mexico Rd

Thoele Rd

94 Hwy

Hemsath (Muegge)

I 270

Ferguson/Airport Twp line

Ferguson City limits

Maline Creek

Normandy/Midland Twp line

2

Walton Rd

St Louis County

University City limits

1

St Louis City

Clayton Rd

Lake Forest Dr

Brentwood

Manchester

Hwy 40

I 44

Rock Hill

Hadley

Berry Rd

Jefferson Twp line

Big Bend Rd

Bowles Rd.

Meramec River

3

Jefferson County

US Congressional Districts
St Louis Area

U.S. Congressional Districts

Jackson County

WANGELIN, Chief District Judge, dissenting.

I respectfully dissent;

The 1980 census revealed that Missouri's population growth failed to keep up with national population growth and consequently Missouri's Congressional delegation was reduced from ten seats to nine. This failure to keep up with national population growth, and in some areas the actual decline in population, was most pronounced in the presently constituted first, second and third districts. I cannot concur with a redistricting plan that rewards areas for loss of population at the expense of areas that have not suffered such dramatic demographic declines. Rather, I would adopt the provisions of the First Extraordinary Session Senate Substitute for Senate Commit-

tee Substitute for House Bill No. 1 [hereinafter the Plan], which is substantially the same as the Dirk Plan offered in the regular session, for the following reasons.

First, the Plan comports with the law as laid down in *Preisler v. Secretary of Missouri*, 341 F.Supp. 1158 (W.D.Mo.1972), and gives consideration to the salvageable portions of the districts created by that decision.

Second, the Plan splits only St. Louis and Jackson Counties[1] and does not split the City of St. Louis. The majority plan not only splits these two counties and others, but also divides the City of St. Louis—an area which has lost population and does not contain the requisite population to constitute even one congressional district. Efforts to give voters in the City of St. Louis input in representation of other areas in more than one district would amount to rewarding the City for its population decline.

The suggestion that St. Charles and Jefferson Counties are part of the St. Louis metropolitan area and should therefore be drawn into overwhelmingly urban districts ignores the fact that population increases in those counties were primarily the result of popular flight from the "St. Louis metropolitan area."

To award multiple representation to the City of St. Louis and one-third of Missouri's congressional delegation to the "St. Louis metropolitan area," is not only unjust political compensation for an area of dwindling population but confounds the principles of representative government and the common sense application of the legal precepts which bind this panel.

The first district shall be composed of all of St. Louis City and the following United States Census Tracts in St. Louis County: Nos. 2199, 2200, 2139, 2140, 2138, 2204.02, 2204.04, 2203, 2205, 2206.02, 2201 and 2202. Total population—543,314.

The second district shall be composed of the following United States Census Tracts in St. Louis County: Nos. 2106, 2105, 2118, 2119, 2104, 2120, 2121, 2122, 2123, 2124, 2125, 2117, 2116, 2115, 2126, 2129, 2128, 2127, 2137, 2136, 2135, 2134, 2130, 2114.02, 2131.01, 2133, 2114.01, 2131.02, 2151.01, 2151.04, 2132.01, 2132.02, 2150.01, 2151.03, 2151.02, 2150.03, 2150.02, 2153.01, 2152.01, 2153.02, 2148, 2149, 2147, 2146, 2144, 2145, 2143, 2159, 2157, 2156, 2155, 2154, 2165, 2158, 2162, 2164, 2163, 2161, 2160, 2141, 2142, 2168, 2169, 2170, 2191, 2171, 2172, 2167, 2166, 2173, 2102, 2103, 2109.03, 2110, 2111, 2112, 2182, 2180.02, 2181, 2189, 2174, 2175, 2188, 2187, 2186, 2185, 2184, 2176, 2177.01, 2180.01, 2183 and 2190. Total population—543,053.

The third district shall be composed of the following counties: Jefferson, Ste. Genevieve, St. Francois, Perry, Madison, Iron, Bollinger, Cape Girardeau, Scott, Stoddard, Wayne, Carter, Ripley, Butler, Dunklin, Pemiscot, New Madrid, and Mississippi. Total Population—547,819.

The fourth district shall be composed of the townships of Fort Osage, Sni-A-Bar, Van Buren, and Prairie in Jackson County, and the counties of Ray, Lafayette, Saline, Howard, Boone, Cooper, Pettis, Johnson, Cass, Bates, Henry, Benton, Morgan, Moniteau, Camden, Hickory, St. Clair, Vernon, and Barton. Total Population—548,028.

The fifth district shall be composed of the Jackson County Townships of Kaw, Blue, Brooking, and Washington. Total Population—548,520.

The sixth district shall be composed of the following counties: Atchison, Nodaway, Worth, Harrison, Mercer, Putnam, Schuyler, Scotland, Adair, Sullivan, Grundy, Daviess, DeKalb, Gentry, Andrew, Holt, Buchanan, Clinton, Caldwell, Livingston, Chariton, Linn, Macon, Randolph, Carroll, Clay, and Platte. Total Population—545,729.

The seventh district shall be composed of the following counties: Cedar, Polk, Dallas, Wright, Webster, Greene, Dade, Jasper, Lawrence, Christian, Douglas, Ozark, Taney, Stone, Barry, McDonald, and Newton. Total Population—545,921.

1. These are the only two counties in Missouri that must be split since their individual population exceeds the population total necessary (546,298) to make one congressional district.

The eighth district shall be composed of the following United States Census Tracts in St. Louis County: Nos. 2215, 2214.02, 2214.01, 2213.03, 2204.03, 2197, 2198, 2210, 2209, 2194, 2195, 2196, 2193, 2192, 2211, 2212.01, 2212.02, 2208.03, 2208.02, 2207.03, 2207.02, 2207.01, 2206.01, 2208.01, 2213.01, 2213.02, and the counties of Cole, Osage, Gasconade, Franklin, Miller, Maries, Washington, Crawford, Phelps, Pulaski, Dent, Laclede, Taxas, Shannon, Reynolds, Howell, and Oregon. Total Population—549,459.

The ninth district shall be composed of the following United States Census Tracts in St. Louis County: Nos. 2113.02, 2113.01, 2113.03, 2109.02, 2109.01, 2108.02, 2108.03, 2108.04, 2107, 2101, 2216, 2151.05, 2152.03, 2178.05, 2178.04, 2177.02, 2152.02, 2179.02, 2179.03, 2179.04, 2178.06, 2178.07, 2178.02, and the following counties: Clark, Lewis, Knox, Shelby, Marion, Monroe, Ralls, Pike, Audrain, Callaway, Montgomery, Lincoln, Warren, and St. Charles. Total Population —545,601.