Edwin C. DOULIN, Helen Lee Adair, Edward F. Ball, William Joseph Barnes, Don E. Davis, Earl W. Harris, Roger D. Harrod, Richard D. Love, Sharon K. Trusty, Nora M. Waye, Almeda Ann Wagner, Analee Vaught, and Clara White, Plaintiffs,

v.

Frank WHITE, Governor of the State of Arkansas; Winston Bryant, Lieutenant Governor of the State of Arkansas; Steve Clark, Attorney General of the State of Arkansas; Paul Riviere, Secretary of State of the State of Arkansas; Julia Hughes Jones, State Auditor of the State of Arkansas; Jimmie Lou Fisher, State Treasurer of the State of Arkansas; Bill McCuen, State Land Commissioner of the State of Arkansas; Herby Branscum, Chairman of the State Democratic Central Committee of the State of Arkansas; Harlan "Bo" Holleman, Chairman of the State Republican Central Committee of the State of Arkansas; Joe Basore, Citizen of the State of Arkansas; E. J. Jacobs, Citizen of the State of Arkansas; Stark Ligon, Citizen of the State of Arkansas; all of the above being Commissioners of the State Board of Elections of the State of Arkansas, Defendants;

Veo Easley, County Judge of Grant County, Arkansas, Plaintiff-Intervenor.

Civ. A. No. LR-C-81-418.

United States District Court,
E. D. Arkansas, W. D.

Feb. 25, 1982.

Robert Walker, Heiskell, Donelson, Bearman, Adams, Williams, & Kirsch, John L. Ryder, Laughlin, Halle, Clark & Gibson, Memphis, Tenn., Stanley D. Miller, Miller, Jones & Goldman, Hot Springs, Ark., for plaintiffs.

R. B. Friedlander, Asst. Atty. Gen., Little Rock, Ark., for defendants.

Phillip H. Shirron, Sheridan, Ark., for plaintiff-intervenor.

Before ARNOLD, Circuit Judge, and OVERTON and WOODS, District Judges.

ARNOLD, Circuit Judge.

On January 5, 1982, we held Act 965 of 1981, the congressional-districting plan enacted by the Arkansas General Assembly, unconstitutional under Art. I, § 2. We announced our intention to order into effect another, constitutional plan by which the 1982 congressional elections would be conducted, unless the Governor, on or before

February 15, 1982, should call the General Assembly into extraordinary session to enact a new, valid plan of its own. 528 F.Supp. 1323. The Governor, apparently with the concurrence of some of the leading members of the Legislature, has decided not to call a special session. It therefore now becomes our duty to adopt a division of the State into four congressional districts.[1]

We now have before us, as possible choices, eight plans: the Ray Plan and the original Miller Bill, both described in our previous opinion, and Plans A through F, one of which (Plan B) was presented by plaintiffs at trial and has already been discussed to a degree, and the other five of which are now proffered by plaintiffs.[2] These various possibilities would result in the following total percentage variances in population between the largest and the smallest districts, according to revised census data:

| | |
|---|---|
| Ray Plan | 1.17% |
| Original Miller Bill | 0.78% |
| Plan A | 0.13% |
| Plan B | 0.17% |
| Plan C | 0.19% |
| Plan D | 0.22% |
| Plan E | 0.36% |
| Plan F | 0.44% |

By way of comparison, it should be recalled that Act 965, which we have held invalid, produced a variance, according to the revised census, of 2.10%. Plaintiffs now urge the adoption of either Plan A or Plan B,

both of which would retain Garland County in the Third District. Defendants urge the adoption of the original, unamended Miller Bill. Copies of Plan A and the original Miller Bill are appended to this opinion as Exhibits A and B respectively, for easy reference. A copy of Plan B was attached as Appendix D to our previous opinion.

Obviously equality of population among districts is the principal criterion at this remedial stage of the case, as it was at the liability stage. See, *e.g., Shayer v. Kirkpatrick, supra,* slip op. at pp. 9–14; *In re Illinois Congressional Districts Reapportionment Cases,* No. 81–C–3915 (N.D.Ill. 1981), *aff'd mem. sub nom. Ryan v. Otto,* —— U.S. ——, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982). If it were the only criterion, our task would be easy. We should simply adopt Plan A, which has the lowest population variance of any plan submitted,[3] and be done with it. But *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), holds that population is not the sole criterion when the time comes for a court to devise a plan to replace an unconstitutional districting arrangement. There, the Texas Legislature had passed a law with a total percentage deviation of 4.13%. A district court held this law unconstitutional, and the Supreme Court agreed, 412 U.S. at 790–93, 93 S.Ct. at 2352–53. The lower court then ordered into effect Plan C, which had a variance of .284%, and rejected Plan B, whose variance was .149%.

---

1. In our previous opinion we expressed the view that leaving the State without districts, so that Members of Congress would all run at large, was a legal possibility, but that, as a matter of discretion, we would prescribe district lines, primarily because congressional elections in Arkansas have never been held at large. We may have been mistaken in believing that at-large election is a permissible option. Although 2 U.S.C. § 2a(c)(5) (1976), passed in 1929, provides that Representatives will be elected at large until a State is redistricted in the manner provided by State law, a later statute, 2 U.S.C. § 2c (1976), enacted in 1967, may have repealed the 1929 law by implication. *Shayer v. Kirkpatrick,* No. 81–4144–CV–C, slip op. at pp. 6–9 (W.D.Mo. Jan. 7, 1982) (three-judge court). We need not decide this question, because even if at-large elections are legally permissible, everyone would agree that they are not required, and we decline, for

reasons already given, to adopt the at-large alternative.

2. We reject the defendants' contention that we may not consider any of the five newly suggested plans, on the theory that the "record was closed" at the conclusion of trial on December 28, 1981. It was our intention to allow either side to make additional suggestions if it became necessary for us to prescribe the remedy in this case. And surely, in a matter of this kind, it is in the public interest for the Court to be open to all suggestions from the parties.

3. As conceded by plaintiffs at oral argument, however, there may be still other plans, none of which would cross county lines or pit one incumbent against another, with an even lower variance.

As to the remedy, the Supreme Court reversed, holding that Plan B should have been adopted. The Court mentioned that Plan B had a lesser population variance, but its analysis did not stop there, as it would have if population had been the sole and exclusive consideration.[4] The Court criticized the lower court's selection of Plan C as "ignor[ing] legislative districting policy and construct[ing] districts solely on the basis of population considerations." 412 U.S. at 796, 93 S.Ct. at 2355. Plan B, it held, should have been adopted, *not only* because it produced districts more nearly equal in population, *but also* because it "most clearly approximated the reapportionment plan of the state legislature, while satisfying constitutional requirements." *Ibid.* The Court's reasoning was summarized as follows:

Here, it is clear that Plan B, to a greater extent than did Plan C, adhered to the desires of the state legislature while attempting to achieve population equality among districts. S. B. 1, a duly enacted statute of the State of Texas, established the State's 24 congressional districts with locations and configurations found appropriate by the duly elected members of the two houses of the Texas Legislature. As we have often noted, reapportionment is a complicated process. Districting inevitably has sharp political impact and inevitably political decisions must be made by those charged with the task. Here those decisions were made by the legislature in pursuit of what were deemed important state interests. Its decisions should not be unnecessarily put aside in the course of fashioning relief appropriate to remedy what were held to be impermissible population variations between congressional districts.

*Id.* at 795–96, 93 S.Ct. at 2354, 2355 (citation omitted).

■ This language fits the case before us. Act 965 of 1981, "a duly enacted stat-

ute of the State of [Arkansas], established the State's [four] congressional districts with locations and configurations found appropriate by the duly elected members of the two houses of the [Arkansas] Legislature." The "decisions" thus "made by the legislature in pursuit of what were deemed important state interests . . . should not be unnecessarily put aside," notwithstanding the fact that Act 965 itself has not withstood constitutional attack. Here, everyone agrees that the original Miller Bill is significantly closer to Act 965 than any of the newly suggested plaintiffs' plans. In fact, Act 965 *is* the Miller Bill, as amended in the House. Adoption of the original Miller Bill would result in the moving of only three counties from their locations as specified in Act 965, while Plan A would require the moving of 17 counties and many more people. The Miller Bill, in its unamended version, would have moved only eight counties from their previous (1971–81) location, while Plan A would move 15. We are not obliged to ignore the fact that the Miller Bill would disrupt existing patterns of constituency-representative relationships far less than Plan A. See *White v. Weiser, supra,* 412 U.S. at 791, 93 S.Ct. at 2352. The original Miller Bill is preferable to Plan B for most of the same reasons (although Plan B would move only eight counties from their location under the previously effective reapportionment of 1971), as well as for the reasons given in our first opinion in this case, in which Plan B was briefly discussed. By adopting the original Miller Bill, we accomplish two important objectives at the same time: population variance is reduced from 2.10% in Act 965 to only 0.78%; and the desires of the people's elected representatives, as expressed by law, are adhered to except for the location of three counties.

Plaintiffs resist this reasoning on two principal grounds. First, they insist that

4. Mr. Justice Marshall, concurring, underscored this analytical divergence. He also would have ordered the adoption of Plan B, but only because the selection of Plan C "failed to adhere strictly to the principle of mathematical precision . . . ." 412 U.S. at 799, 93 S.Ct. at 2356. In his view, "the apparent desires of the controlling state political powers," *ibid.,* were irrelevant.

adoption of the Miller Bill cannot be justified as a permissible deference to State policy, because the General Assembly, in passing Act 965, necessarily rejected the Miller Bill as originally introduced. They regard as irrelevant the fact that the original Miller Bill passed the Senate, relying on cases such as *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 197, 92 S.Ct. 1477, 1484, 32 L.Ed.2d 1 (1972) (per curiam), which holds that even a reapportionment plan passed by both houses, but which failed to become law, does not amount to a State policy to which courts should defer in the present context. This argument misses the mark. It is not the original Miller Bill that represents the State policy which we believe should be taken into account, but Act 965 itself, which passed both houses *and* became law. That the original Miller Bill comes closer to Act 965 than either Plan A or Plan B is therefore a point clearly in its favor under the *White v. Weiser* analytical framework.

Second, plaintiffs correctly point out that under *White v. Weiser* State policy can be a factor only in choosing between two proposed remedies both of which are "fully adequate to redress constitutional violations," 412 U.S. at 797, 93 S.Ct. at 2355. If the original Miller Bill would produce an unconstitutional variance in population, obviously we could not adopt it, however much it would accord with the policy of the State. At the trial of this cause, speaking in the context of those plans actually considered by the Legislature in 1981, counsel for plaintiffs virtually conceded that they would have had no constitutional claim had the Legislature passed the Miller Bill without amendment at that time. Now, however, it is suggested that the Miller Bill would not be constitutional, because other plans (A through F) are available that would produce a smaller population variance. This proposition is only another way of saying that we must of necessity always select that plan put forward by the parties that more nearly approaches precise mathematical equality—a conclusion forbidden, in our view, by *White v. Weiser*, or, at any rate, by its necessary logical implications.

The situation would be quite different if the Arkansas Legislature had utterly failed in its duty to pass a new reapportionment law after the 1980 census. The case would then be akin to *Shayer v. Kirkpatrick, supra* (Missouri); *In re Illinois Congressional Districts Reapportionment Cases, supra*; and *Dunnell v. Austin*, 344 F.Supp. 210 (E.D. Mich.1972), in each of which the State legislatures involved had passed no reapportionment law since the last census. Here, the Arkansas General Assembly did make a genuine effort, untainted by any suspect or invidious motives. The division of the State made by Act 965 is therefore entitled to some weight in the process of fashioning a remedy. Whether this State policy is weighty enough to justify the 0.65% difference in variance between Plan A and the original Miller Bill is, we suppose, a question of judgment, as to which reasonable people may differ. It is our judgment that the original Miller Bill is close enough to the State policy embodied in Act 965, and Plan A different enough from that policy, to make the adoption of the original Miller Bill the more judicious remedy in this case.

A final decree will be entered accordingly. The original Miller Bill will be adopted as the congressional-districting plan for the State of Arkansas, to remain effective unless and until the General Assembly, at some future session, regular or special, enacts a different and constitutionally sufficient plan.

IT IS SO ORDERED this 25th day of February, 1982.

## FINAL DECREE

This cause having come on for trial before the undersigned, duly convened as a three-judge District Court under 28 U.S.C. § 2284(a), on December 28, 1981; this Court having entered its order on January 5, 1982, declaring Act 965 of the 1981 Arkansas General Assembly unconstitutional under Article I, Section 2, of the Constitution of the United States; the Governor of Arkansas having announced his intention not to call an Extraordinary Session of the Gener-

al Assembly for the purpose of enacting a new and valid reapportionment plan; all parties having filed further briefs and suggestions as to remedy; oral argument having been allowed before the Court on February 22, 1982; and the Court being well and sufficiently advised in the premises,

It is by the Court this 25th day of February, 1982, CONSIDERED, ORDERED, ADJUDGED, and DECREED:

1. That the defendants, and each of them, jointly and severally, their agents, servants, and employees, be, and they are hereby, enjoined and restrained from conducting or taking part in any elections for Representative in Congress from the State of Arkansas from and after the date hereof except in accordance with that certain plan of reapportionment referred to in our opinion of even date herewith as the original Miller Bill, a copy of which is attached hereto and incorporated herein by reference.

2. This order shall remain in effect unless and until the Arkansas General Assembly, at some regular or extraordinary session hereafter convened, shall enact into law a different and constitutionally sufficient reapportionment plan.

APPENDIX A

EXHIBIT A

Plan A

0.134

OFFICIAL
ARKANSAS
1980
CENSUS POPULATIONS
BY COUNTY

PUBLISHED BY
PAUL RIVIERE
SECRETARY OF STATE

APPENDIX B

OFFICIAL
## ARKANSAS
1980
CENSUS POPULATIONS
BY COUNTY

PUBLISHED BY
PAUL RIVIERE
SECRETARY OF STATE