Jessie TURNER; Christine Brownlee; Jack Foster; Alan Smith; and Freddie Lyon, Plaintiffs,

v.

The STATE OF ARKANSAS; Bill Clinton, Governor of the State of Arkansas; William J. McCuen, Secretary of State of the State of Arkansas; John M. Lipton, Speaker of the Arkansas House of Representatives; and Jerry P. Bookout, President Pro Tempore of the Arkansas Senate, Defendants.

Civ. No. LR–C–91–295.

United States District Court, E.D. Arkansas, W.D.

Nov. 15, 1991.

Bob R. Brooks, Jr., Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., North Little Rock, Ark., W. Asa Hutchinson, Karr & Hutchinson, Fort Smith, Ark., for plaintiffs.

Tim C. Humphries, Atty. General's Office, Little Rock, Ark., for defendants.

P.A. Hollingsworth, Hollingsworth Law Firm, P.A., Little Rock, Ark., Olly Neal, Jr., Wilson, Bell & Neal, Marianna, Ark., for intervenors-plaintiffs.

Jim Malone, Jr., pro se.

## OPINION

## MAL–APPORTIONMENT CLAIM

EISELE, District Judge.

In 1982 a Three Judge District Court composed of Circuit Judge Richard Arnold and District Judges Overton and Woods held that Act 1965 of 1981 of the Arkansas General Assembly was unconstitutional under Article I, Section 2. The Court then announced its intention to order into effect a new plan unless the Governor called the General Assembly into extraordinary session to enact a new, valid plan of its own. The Governor, with the concurrence of some legislators decided not to call a special session and it therefore became the duty of the Court to order into effect its own congressional redistricting plan.

The parties in the *Doulin* case then submitted to the Court eight different plans, identified as the Ray Plan, the original Miller Bill and plans A through F. Apparently plans A through F were all presented at or after the trial by the plaintiffs. The variances from the ideal ranged from 1.17% for the Ray Plan down to 0.13% for Plan A. The "original Miller Bill" had a tolerance of 0.78%. The plans submitted by the plaintiffs ranged from 0.13% (Plan A) to 0.44% (Plan F). By way of comparison Act 1965, which the Court declared invalid, produced a 2.10% variance. The plaintiffs in *Doulin*, urge the Court to adopt either Plan A (0.13% variance) or Plan B (0.17%). The defendants urged the adoption of the original unamended Miller Bill (0.78% variance). Because Judge Arnold's opinion explains in detail the Court's decision to adopt the

"original Miller Bill" Plan (0.78% variance) we quote it at length as follows:

"(1) Obviously equality of population among districts is the principal criterion at this remedial stage of the case, as it was at the liability stage. See, e.g. *Shayer v. Kirkpatrick, supra* [541 F.Supp. 922, 928], slip op. at pp. 9–14; *In re Illinois Congressional Districts Reapportionment Cases*, No. 81–C–3915 (N.D.Ill.1981), aff'd mem. sub nom. *Ryan v. Otto*, [454] U.S. [1130], 102 S.Ct. 985, 71 L.Ed.2d 284 (1982). If it were the only criterion, our task would be easy. We should simply adopt Plan A, which has the lowest population variance of any plan submitted, and be done with it. But *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), holds that population is not the sole criterion when the time comes for a court to devise a plan to replace an unconstitutional districting arrangement. There, the Texas Legislature had passed a law with a total percentage deviation of 4.13%. A district court held this law unconstitutional, and the Supreme Court agreed, 412 U.S. at 790–93, 93 S.Ct. at 2352–53. The lower court then ordered into effect Plan C, which had a variance of .284%, and rejected Plan B, whose variance was .149%.

"As to the remedy, the Supreme Court reversed, holding that Plan B should have been adopted. The Court mentioned that Plan B had a lesser population variance, but its analysis did not stop there, as it would have if population had been the sole and exclusive consideration. The Court criticized the lower court's selection of Plan C as "ignor[ing] legislative districting policy and construct[ing] districts solely on the basis of population considerations." 412 U.S. at 796, 93 S.Ct. at 2355. Plan B, it held, should have been adopted, not only because it produced districts more nearly equal in population, but also because it "most clearly approximated the reapportionment plan of the state legislature, while satisfying constitutional requirements." *Ibid.* The Court's reasoning was summarized as follows:

"Here, it is clear that Plan B, to a greater extent than did Plan C, adhered to the desires of the state legislature while attempting to achieve population equality among districts. S.B. 1, a duly enacted statute of the State of Texas, established the State's 24 congressional districts with locations and configurations found appropriate by the duly elected members of the two houses of the Texas Legislature. As we have often noted, reapportionment is a complicated process. Districting inevitably has sharp political impact and inevitably political decisions must be made by those charged with the task. Here those decisions were made by the legislature in pursuit of what were deemed important state interests. Its decisions should not be unnecessarily put aside in the course of fashioning relief appropriate to remedy what were held to be impermissible population variations between congressional districts.

*Id.* at 795–96, 93 S.Ct. at 2354, 2355 (citation omitted).

"(2) This language fits the case before us. Act 965 of 1981, "a duly enacted statute of the State of [Arkansas], established the State's [four] congressional districts with locations and configurations found appropriate by the duly elected members of the two houses of the [Arkansas] Legislature." The "decisions" thus "made by the legislature in pursuit of what were deemed important state interests ... should not be unnecessarily put aside," notwithstanding the fact that Act 965 itself has not withstood constitutional attack. Here, everyone agrees that the original Miller Bill is significantly closer to Act 965 than any of the newly suggested plaintiffs' plans. In fact, Act 965 *is* the Miller Bill, as amended in the House. Adoption of the original Miller Bill would result in the moving of only three counties from their locations as specified in Act 965, while Plan A would require the moving of 17 counties and many more people. The Miller Bill, in its unamended version, would have moved only eight counties

from their previous (1971–81) location, while Plan A would move 15. We are not obliged to ignore the fact that the Miller Bill would disrupt existing patterns of constituency-representative relationships far less than Plan A. See *White v. Weiser, supra,* 412 U.S. at 791, 93 S.Ct. at 2352. The original Miller Bill is preferable to Plan B for most of the same reasons (although Plan B would move only eight counties from their location under the previously effective reapportionment of 1971), as well as for the reasons given in our first opinion in this case, in which Plan B was briefly discussed. By adopting the original Miller Bill, we accomplish two important objectives at the same time: population variance is reduced from 2.10% in Act 965 to only 0.78%; and the desires of the people's elected representatives, as expressed by law, are adhered to except for the location of three counties.

"Plaintiffs resist this reasoning on two principal grounds. First, they insist that adoption of the Miller Bill cannot be justified as a permissible deference to State policy, because the General Assembly, in passing Act 965, necessarily rejected the Miller Bill as originally introduced. They regard as irrelevant the fact that the original Miller Bill passed the Senate, relying on cases such as *Sixty–Seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 197, 92 S.Ct. 1477, 1484, 32 L.Ed.2d 1 (1972) (per curiam), which holds that even a reapportionment plan passed by both houses, but which failed to become law, does not amount to a State policy to which courts should defer in the present context. This argument misses the mark. It is not the original Miller Bill that represents the State policy which we believe should be taken into account, but Act 965 itself, which passed both houses *and* became law. That the original Miller Bill comes closer to Act 965 than either Plan A or Plan B is therefore a point clearly in its favor under the *White v. Weiser* analytical framework.

"Second, plaintiffs correctly point out that under *White v. Weiser* State policy can be a factor only in choosing between two proposed remedies both of which are "fully adequate to redress constitutional violations," 412 U.S. at 797, 93 S.Ct. at 2355. If the original Miller Bill would produce a unconstitutional variance in population, obviously we could not adopt it, however much it would accord with the policy of the State. At the trial of this cause, speaking in the context of those plans actually considered by the Legislature in 1981, counsel for plaintiffs virtually conceded that they would have had no constitutional claim had the Legislature passed the Miller Bill without amendment at that time. Now, however, it is suggested that the Miller Bill would not be constitutional, because other plans (A through F) are available that would produce a smaller population variance. This proposition is only another way of saying that we must of necessity always select that plan put forward by the parties that more nearly approaches precise mathematical equality—a conclusion forbidden, in our view, by *White v. Weiser,* or, at any rate by its necessary logical implications. The situation would be quite different if the Arkansas Legislature had utterly failed in its duty to pass a new reapportionment law after the 1980 census. The case would then be akin to *Shayer v. Kirkpatrick, supra* (Missouri); *In re Illinois Congressional Districts Reapportionment Cases, supra;* and *Dunnell v. Austin,* 344 F.Supp. 210 (E.D.Mich.1972), in each of which the State legislatures involved had passed reapportionment law since the last census. Here, the Arkansas General Assembly did make a genuine effort, untainted by any suspect or invidious motives. The division of the State made by Act 965 is therefore entitled to some weight in the process of fashioning a remedy. Whether this State policy is weighty enough to justify the 0.65% difference in variance between Plan A and the original Miller Bill is, we suppose, a question of judgment, as to which reasonable people may differ. It is our judgment that the original Miller Bill is close enough to the State policy embod-

ied in Act 965, and Plan A different enough from that policy, to make the adoption of the original Miller Bill the more judicious remedy in this case."

*Doulin v. White,* 535 F.Supp. 450 (1982).

The deference paid by the *Doulin* Court to legislative choices is noteworthy.

The defendants here put on the testimony of Mr. Pat Flannigan who has been a member of the House of Representatives of the Arkansas General Assembly since 1976. He comes from Forrest City and serves St. Francis, Monroe and parts of Lee Counties. He was the chairman for the subcommittee in charge of congressional redistricting for the 1991 legislative session. He explained the adoption by the House and Senate of Concurrent Resolution 1006 which proposed to set forth the ground rules for the upcoming congressional redistricting. His testimony makes it clear that it was the desire of the legislature to adopt a 1991 congressional redistricting plan that was as close to the plan approved by the *Doulin* Court as possible. The whole idea was to try to make as few changes as possible to meet the "one person, one vote" standard. The legislature wished, to the extent possible, to leave people and counties within the same congressional district wherein they were located in 1982 after the *Doulin* decision. The members were interested in preserving traditional communities of interest. And they wanted the plan to maintain the integrity of county and city boundaries.

Six separate bills and plans were submitted to the legislature which would result in variances of less than 0.73%—the variance occasioned by Act 1220 of 1991. For instance HB 1883 would have had only a 0.11% variance; HB 1930 a .65% variance and the "Capps" proposal, a 0.41% variance. But no proposal produced fewer shifts of counties or less movement of population than Act 1220. More specifically Act 1220 of 1991 resulted in the relocation of six counties into different congressional districts from those in which they were located in 1982, and the changes made affected a total population of only 96,164. By contrast HB 1883 affected seven counties and 130,280 people; HB 1930, eight counties and 144,801 people; HB 1942, eight counties and 127,459 people; and S.B. 727, thirteen counties and 236,565 people.

As noted above the plan approved in *Doulin* produced a variance of 0.78%, which is in excess of the .73% variance for Act 1220 of 1991. Judge Arnold in *Doulin* pointed out that state policy can be a factor only in choosing between two proposed remedies, both of which are "fully adequate to redress constitutional violations." If the .78% variance met this test in *Doulin* then it would appear that the .73% variance also meets that test here. Does *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) alter the test?

There is no question that here, as in *Doulin* the legislature could have adopted a redistricting plan—even one respecting the integrity of county and city boundaries—that would have produced a variance from the ideal of less than that produced by Act 1220. The question then becomes whether this higher variance is needed to achieve some "legitimate state objective". The *Karcher* Court stated:

"Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives.... The State must, however, show with some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions. The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to those factors."

No plan suggested by the plaintiffs or intervenors would meet the twin objectives

of causing the fewest changes in the location of counties and people as well as Act 1220. Those are two key legitimate legislative objectives. That Act also preserved other values important to the state as set forth in Concurrent Resolution 1006.

The Flannigan proposal (H.B.1883) is the only one posing a serious challenge and, indeed, the only one producing a significant reduction in the variance. The other two which merit some consideration would be H.B.1930 (which would reduce the variance from .73 to .65 or a total of .08) and the "Capps proposal" (which would reduce the variance from .73 to .41, or a total of .32). But H.B. 1883 stretches from the Missouri to the Louisiana line and splits the "mountain" community of interest.

The Court acknowledges that this is a close case. The opponents to Act 1220 have done an excellent job in exposing the weaknesses of the defendants' case. Nevertheless, the Court is of the opinion that it is obligated to give deference to the decision of the Arkansas Legislature, whose duty it is, after all, to formulate and enact a redistricting plan. The Court finds that the guideline decisions made by the legislature concerning redistricting were legitimate and reasonable and were also within its competence to make. The malapportionment claim of the plaintiffs and of the Lonoke County intervenor, Mr. Malone, must therefore be dismissed.